Nixon v. Walter.

---

WILLIAM G. NIXON

*v.*

BENJAMIN R. WALTER et ux. et al.

1. Where the fact of complainant's peaceable possession of the premises is disputed, in a proceeding under the statute to quiet title (*Rev. p. 1189*), he must establish it, or fail; but, in a proper case, the proceeding may, if he should fail to show possession, be sustained as a suit *quia timet*, irrespective of the statute.

2. Where the western boundary of defendant's land is stated in her deed to be high-water mark, and complainant, whose land adjoins it on the west, avers and proves that by the encroachment of the water of the bay at that point the defendant's land has entirely disappeared—*Held,* that a bill *quia timet* was the appropriate means of clearing complainant's title of the cloud cast upon it by the defendant's deed.—*Held, also,* defendant's claim that her west line fluctuates with the advancing or receding shore line cannot be sustained.

Bill to quiet title. On final hearing on pleadings and proofs.

*Mr. S. H. Grey*, for complainant.

*Mr. D. J. Pancoast*, for answering defendants.

THE CHANCELLOR.

This suit is brought under the act " to compel the determination of claims to real estate in certain cases, and to quiet the title to the same." *Rev. p. 1189*. The bill alleges that the complainant, ever since the conveyance of the property in question to him, has been in peaceable possession thereof—claiming to own and owning the same in fee simple. One of the defendants has answered. She denies that the complainant is or ever has been in possession of the property under or by virtue of his conveyance, or in any other way or manner; and she alleges that she and those under whom she claims title, have had possession for over twenty years, and have been accustomed to use the property for the only purpose for which it has been or is valuable, viz., digging and removing sand for moulding and other purposes. There is no proof in the cause that the complainant is or ever has been in possession of the property. In order to maintain a suit under the statute, it is necessary that the complainant be in peaceable possession of the land under a claim of ownership. The statute was passed for the relief of a class of persons who, up to that time, had been without remedy—those who, being in peaceable possession of land of which they believed themselves to be the owners, were vexed and injured by claims of title to, or interest in or encumbrance upon it by others, or by denials of or imputations upon their title, and there was no suit pending to enforce or test the validity of such claim, or to silence such denial, or clear up such doubts. Such persons had no means of removing the cloud except under peculiar circumstances, and could not bring their title to a test. The complainant, by the allegations of his bill, has brought himself within the provisions of the statute; but the jurisdictional averment of possession was liable to be controverted, and it was con-

Nixon v. Walter.

troverted and issue joined upon it. It was, thereupon, incumbent upon him to establish its truth. Not only has he not done so, but he has made no attempt whatever in that direction. His suit, therefore, cannot be maintained under the statute. But it can be supported as a suit *quia timet*, irrespective of the statute.

The complainant claims to be the owner of land bounded by the line of high water in Delaware bay and Maurice river cove. He states that the defendants claim to be the lawful owners of part thereof, viz., a strip six rods wide, the whole length thereof, bounded on high-water mark. He insists that they have no title whatever to that strip, but that the strip which was conveyed by the deeds under which they claim title, and which was between his land and high-water mark, as it stood when the title to the strip, as a separate tract, originated, has been submerged by the encroachment of the waters of the bay, which have covered it entirely. A court of equity will set aside a deed as a cloud upon title where it is invalid, and extrinsic evidence is necessary to show its invalidity; especially if such evidence be oral testimony. Here are deeds which, upon their face, convey title to part of the complainant's land, while, if the complainant is right, they, in fact, convey, and were intended to convey, other and different land which, from natural causes, has disappeared, temporarily if not permanently, and it is necessary to produce extrinsic evidence by the testimony of witnesses testifying as to their personal knowledge of the locality, derived from long observation, to show the fact—to show where the line of high water is at this time, and that it has shifted inland more than six rods since the making of the original conveyances for the strip as a separate tract under which the answering defendant claims title. It is true that if the answering defendant is in possession, the complainant might bring an action of ejectment to try the title, and so bring her claim to a legal test.

The evidence on the subject of the possession is that the answering defendant, or those under whom she claims, have from time to time dug and removed sand for sale from the land in question, (which is a mere unenclosed and unoccupied sand-bank), and have paid taxes for the property, and that she and others

claiming with her under the same claim of title brought suit against some other person or persons for trespass on the property, and recovered in the action. The removal of sand was, if the complainant was the owner of the property, a trespass merely, and the payment of tax, either irrespective of or in connection with such removal, is not evidence of possession. Other persons who made no claim of title also have taken the sand from time to time without leave or license. The witness who testifies that the answering defendant, and those who claimed with her under the same claim of title, took sand, says that a good many persons trespassed upon the property and took the sand without leave. But in my view of the case, the complainant's right to maintain this suit does not depend upon the decision of the question whether he could maintain an action at law to test the defendant's claim. He does not admit, but denies, that the defendants have ever had possession. If the land is his, and they have an apparent but unreal title to it, he is entitled to relief in this court. Under such circumstances, the relief which is appropriate is such as this court can best give. What is required to relieve the complainant is a decree that the answering defendant has no title under her deeds to the land described in his deeds—to declare and establish the rights of the parties with reference to the present situation. There can be no doubt, and, indeed, the fact is not denied, that the six-rod strip which was the subject of the conveyance under which the answering defendant claims, has been, since the time when some of those conveyances were made, covered by the waters of the bay, by the encroachment thereof. The answering defendant claims that, notwithstanding that fact, she has title to a six-rod strip answering the description, taking the present high-water line as the boundary on the bay. That claim cannot be supported. The deeds under which she claims convey a strip of land by explicit boundaries, one of which was the high-water line. By the term " beach," in the expression " back of the beach," was meant high-water line. *Trustees of East Hampton* v. *Kirk, 68 N. Y. 459.* Had there been accretions to the strip by imperceptible degrees, the owners of the property would have been entitled to them. On the other

hand, if, by encroachment of the waters of the bay, it has been and is submerged and lost, the loss fell, not on the adjoining owner, but on those who owned the land submerged. It was held, in *Scratton* v. *Brown, 4 Barn. & Cress. 485,* that the grantee of the shore of navigable waters does not take a fixed freehold, but one that shifts as the shore recedes or advances; but there the grant was of the shore—the land between high and low-water marks; a shifting thing, not, as here, of a strip bounded by the shore. In *Cook* v. *McClure, 58 N. Y. 437,* where a boundary line was "along the high-water mark" of a pond, it was held that the line thus given was a fixed and permanent one, the line of high water at the date of the deed, and did not follow the changes of the high-water mark of the pond. In this case the six-rod strip was, when it was first conveyed, a definite parcel of land. It has been covered by the waters of the bay, so that that which was the high-water or beach line when the original conveyance for the strip as a separate tract under which the answering defendant derives her title was given, is now at least six rods below the present high-water or beach line. Such being the fact, she has no title under her deed to any part of the land covered by the complainant's deeds. The following is the history and derivation of the titles: April 13th, 1735, Samuel Cotton located a tract of marsh by virtue of a deed of right. The tract was said to contain about three thousand two hundred acres, and the strip was included in it. In 1764, the sheriff of Cumberland, under execution, sold and conveyed the tract to Robert Towers and John Towers. It appears that in 1768, they conveyed to Silas Parvin an undivided one-third of the beach, which is in the deed described as follows: beginning at the mouth of a creek (said to be Broad Oyster creek) next above False Egg Island Point; thence, to extend down the several courses of the bay to the mouth of Egg Island Thoroughfare; thence, along the same thoroughfare, to the mouth of a small creek or gut, nearly opposite the northeast part of Egg Island; thence, up the creek or gut, ten rods from the bay; thence, to continue a course ten rods from the bay, from the side of the thoroughfare up to near the upper point of Egg Island Thoroughfare; thence, six rods wide,

on the marsh on the back of the beach, and to continue the same breadth on the back of the beach, up the bay, to the creek next False Island Point, and thence down the said creek to the place of beginning; containing two hundred acres, more or less. In 1785, Clarence Parvin, the only child and heir of Silas Parvin, who had died intestate, conveyed that third of the beach to Robert Towers, Jr. In 1787, the sheriff of Cumberland sold and conveyed that third, under execution against Robert Towers, Jr., to Robert Towers, Sr. The latter was, before that time, owner of half of the marsh and one-third of the beach. By this conveyance he became the owner of two-thirds of the beach.

By his will, made in 1791, he gave all his lands to his three daughters, Margaret and Elizabeth Towers and Sarah Evans. Margaret died after his death, and her two sisters inherited her share. Elizabeth subsequently devised her interest to her surviving sister, Mrs. Evans. She died intestate, and her only son and heir, Robert T. Evans, inherited from her the half of the marsh and two-thirds of the beach. By his deed, made in 1845, he conveyed those interests to James Dunlap. The beach is in that deed described as in the above-mentioned deed from Clarence Parvin, and the marsh is described as follows: bounded on the easterly side by Dividing creek; on the northwest by Broad Oyster creek; on the southeasterly by the aforesaid tract of two hundred acres and Delaware bay, and on the northerly side by          ; containing three thousand acres, excepting five acres sold to the United States for a lighthouse. John Towers, Sr., by his will, made in 1778, devised his interest in the marsh and beach to his son, John Towers, Jr., and he conveyed it, in 1810, to Philip Walter, four of whose " children, grandchildren and devisees," conveyed that property to the other, Peter B. Walter, in 1833, and he conveyed, in 1846, to George Sheppard, all his right and title to a tract of marsh " beginning at a post standing on the west side of Dividing creek, by the mouth of a small creek, being the third creek from the mouth of said Dividing creek on the west side thereof; from thence, north-westwardly, thirty-five degrees five chains, to a post for a corner; thence, west, northerly six degrees ninety-five chains, to a post

standing by Oronocan creek; thence, down the same creek, bounding thereon, to the mouth of the thoroughfare; thence, down along the same thoroughfare, bounding therewith, to the Broad Oyster creek; thence, down the same creek, to the bay; thence, down the bay on the several courses and distances thereof, to the mouth of Dividing creek aforesaid; thence, up the said Dividing creek, bounding thereon, to the beginning; containing thirty-two hundred acres, more or less." George Sheppard, in June, 1848, conveyed his interest (one undivided half) in the marsh to James Dunlap (who already owned the other undivided half), by deed which describes the marsh as being bounded on the southeast side by a tract of land containing two hundred acres, more or less, belonging to Arthur McCarney, and also by Delaware bay. The tract of five acres sold to the United States government for a lighthouse was excepted. Dunlap, in July, 1848, conveyed his undivided two-thirds of the beach to Arthur McCarney, and George Sheppard, in December, 1848, conveyed his third of the beach to him, so that in 1848, McCarney became the owner of the whole of the beach. The land so conveyed is, according to the description in those deeds to McCarney, a strip of " sand beach" six rods wide " on the back of the beach." The description is as follows: beginning at the mouth of the creek formerly called Broad Oyster creek, and runs thence, down Delaware bay the several courses and distances thereof, to Egg Island Point; thence, down the point to Maurice river cove; thence, down the cove to Oronoken creek; thence, up said creek, six rods on the back of the beach, to Egg Island Point, and to continue the same breadth, six rods, on the back of the beach, to Broad Oyster creek; thence, down the same creek to the beginning; containing two hundred acres, more or less. McCarney then, in 1848, owned the strip, and Dunlap owned the marsh. In 1850, McCarney conveyed the beach, or six-rod strip, to Benjamin R. and Washington Walter. The property is described in that deed as a sand-bank or tract of land situate &c., and is conveyed by the same description last quoted. Washington Walter died intestate and without issue, and his brother Benjamin inherited his interest. Benjamin died intestate. His heirs-

at-law were Benjamin R. Walter, Jr., Caroline Voorhees, Rebecca Sheppard, Emma Neal, Mary Jane Leidy, Anna R. Berry, Albert W. Nichols, Emma Larkin, Mary Morgan, Sarah James and Mary Horn. In 1878, the United States government took, by condemnation, the title of those heirs-at-law to a strip six rods wide, along the shore in front of the lighthouse property at Egg Island Point. In 1854, Dunlap, who owned all the marsh, conveyed an undivided half of it to Furman L. and Lewis Mulford. Part of the description in the deed is as follows : thence, down said creek (Broad Oyster creek), bounding thereon, to a stake standing six rods on the back of the beach ; thence, down Delaware bay the several courses and distances thereof, six rods back of the beach, to the mouth of Ockonock (Oronoken) creek ; thence, down the said Ockonock creek to Maurice river cove; thence, down said cove to the mouth of Dividing creek ; thence, up said creek to the place of beginning.

The deed states that the property described is the same which was conveyed to Dunlap by Evans and Sheppard, as before mentioned. Dunlap evidently intended to convey to the Mulfords half of all he had. In May, 1866, Dunlap and the Mulfords conveyed one-fourth of their interests in the marsh to Jacob Sutton, and in May, 1867, Dunlap conveyed his remaining interest to the Mulfords. The deed to them describes the marsh, in the general description, as being bounded on the southeastwardly by Delaware bay, but in the particular description the fourth course runs " along the thoroughfare to Broad Oyster creek, and thence, down the creek, to a stake standing six rods inside the beach, as per survey made by Ephraim B. Lawrence in 1849, and thence, down the bay the several courses of said survey, to the mouth of Dividing creek ; thence, up said creek, to the place of beginning." By this deed the grantors evidently intended to convey one-fourth of all their interest in the whole of the marsh property. Sutton, in 1870, conveyed his interest—the before-mentioned one-fourth of the marsh—to Thomas E. Fleetwood, who, in 1880, conveyed it (except about twenty acres, which he and the Mulfords had conveyed to the United States government) to Lewis Mulford. The Mulfords, in March, 1881, conveyed the marsh to the com-

plainant by the same description as that contained in the deed from Dunlap to them. The deed excepts from the conveyance the land sold to the United States government—the five acres and the twenty acres—also land conveyed to David Compton, and land conveyed to George Moore. Furman L. Mulford died March 23d, 1881, the next day after the date of the before-mentioned deed to the complainant. He left a will, made in 1878, by which he devised all his interest in the marsh to Lewis Mulford. In March, 1883, Lewis Mulford, by a deed of confirmation, declaring that there was a mistake in the description of the deed from the Mulfords to the complainant, and that the grantors intended to convey all the marsh, down to high-water mark in the bay, without excepting or recognizing the existence of any such beach as that described in the before-mentioned deeds to McCarney (which beach, it declared, had been washed away, and was covered by the waters of the bay), and that the mistake in bounding the marsh, in the deed of 1881, upon the strip, was caused by taking the description from a deed made when part of the strip still remained, confirmed the property to the complainant by a description bounding the land by high-water mark on the bay and Maurice river cove, from the mouth of Broad Oyster creek to the mouth of Dividing creek.

It will be seen that, in 1768, Robert and John Towers and Silas Parvin owned the whole tract, including both marsh and beach. Each had an equal undivided third. In 1785, Clarence Parvin conveyed his interest in the strip of beach to Robert Towers, Jr., whose title thereto was conveyed, by sheriff's deed, in 1787, to Robert Towers, Sr., who was then, after the delivery of that deed to him, the owner of two-thirds of the beach. He was also the owner of half the marsh. The rest of each was owned by John Towers. It was not until 1848 when Sheppard and Dunlap, respectively, conveyed to McCarney their interests in the beach, that a conveyance of that land, or any interest therein, not accompanied by a conveyance of an interest in the marsh, was made to any one. But then, and subsequently, it was conveyed separately. The proof is clear that the whole of the strip has been washed away and covered by the waters of the bay.

There is no contrariety in the evidence. Daniel M. Loper testifies that, in his judgment, the encroachment along the beach, from Broad Oyster creek to Oronoken creek, within the last forty years, is three times as much as six rods. George Shropshire says that there have been more than six rods washed away around the marsh in the last twenty-five years. Thomas Hand says that from Broad Oyster creek to Oronoken the beach has gone away more than one hundred yards. Thomas Garrison and James G. Gandy also testify to the encroachment, and William B. Trenchard, a surveyor, testifies to it according to measurement and comparison with the maps. One of the maps was made by E. B. Lawrence, a surveyor, for Dunlap, in 1849, and the other is a reduced copy of it. Mr. Trenchard says that the greatest difference between high water at this time and high water in 1849, as shown on the original map, along the whole of the shore from Broad Oyster creek to Oronoken creek, is eleven chains, or forty-four rods, and the least, two chains, or eight rods.

It is urged that the recognitions of the existence of the strip, in the deeds to the Mulfords, estop the complainant, who holds under them, from denying it. But it is entirely clear that there is no ground whatever for this claim. The conveyances made by Dunlap to the Mulfords and Sutton were all made after he had conveyed away his interest in the strip. The question is not whether the strip was not, at some time, conveyed, nor as to its dimensions and location when it subsisted, but whether what was conveyed still subsists.

The claim of title by adverse possession set up in the answer has not been sustained. The evidence of possession before referred to is not sufficient to establish such title. *Cobb* v. *Davenport, 3 Vr. 369, 385 ; 3 Wash. R. P. 140 ; Wheeler* v. *Spinola, 54 N. Y. 377.*

There will be a decree declaring that the deeds under which the answering defendant claims convey no title to the land conveyed by the deeds of the Mulfords to the complainant, or any part thereof. The complainant is entitled to costs.