Complainants own a lot designated on the tax map of the city of Bayonne as number 7 in block 154 and the defendant city of Bayonne has record title to the adjoining lot on the east, designated on said map as number 8. The map shows both lots fronting on the southerly line of East Thirty-eighth street. The tax map of the city made from actual survey in *Page 10 
1875 by Emmet Smith, city surveyor, shows both lots as having a depth of one hundred feet running south at right angles from East Thirty-eighth street and lot 7 (on the Smith map numbered 10) as being twenty-five feet wide in front and rear and lot 8 (on the Smith map numbered 11) as being twenty feet wide in front. The Smith map also shows the easterly line of lot 8 as binding, for its entire depth, on high water mark of New York bay.
Complainants claim that lot 8, which in 1875 was thus shown to be riparian land, is submerged and now wholly under tide water and that high water mark on the bay is now on lot 7. On July 16th, 1934, they filed application with the State Board of Commerce and Navigation for a riparian lease with option to purchase, for the lands under the waters of the bay adjacent to and in front of lot 7, on which application no action has been taken by the board.
While complainants' application was pending and with full knowledge thereof, the city of Bayonne made application to said board for a riparian grant and option to it, claiming that its lot 8 is the upland bordering on the bay and therefore it was entitled to the grant sought. February 1st, 1937, the board resolved to grant the city's application upon proof of the statutory requirements, upland ownership and payment of consideration and on June 7th, 1937, without notice to complainants, the board delivered to the city a riparian grant for lands under the tidal waters of the bay in front of lot 8.
March 9th, 1937, complainants instituted certiorari
proceedings in our supreme court against the board, the city and Central District, Inc. (the last named having had an interest in the grant sought which it subsequently assigned to the city), to review all resolutions and proceedings of the board touching the subject-matter of the controversy. The grant and option to the city not having been made at the time, the State of New Jersey could not properly have been made a party to the suit. Testimony taken in the proceedings was submitted to the supreme court with the parties' briefs, and argument was had. January 28th, 1938, Mr. Justice Bodine filed an opinion denying the writ on the ground that the court of chancery had jurisdiction and could give a more adequate remedy, and by order dated and filed February 3d 1938, the *Page 11 
supreme court on its own motion, entered an order transferring the cause to this court with the record and all papers and exhibits. The supreme court stated in said order that it was without jurisdiction and that the matter was one that should be determined by this court.
Pursuant to this court's rules, complainants filed a petition in this court setting out their cause of action against the board, the city and Central District, Inc., and praying a decree (a) adjudging that they are riparian owners of lot 7 and as such are entitled to a riparian lease and option to purchase said lands under their application filed with said board; (b) that the grant and option executed by the board to the city is void so far as it affects complainants' lands; (c) that this court determine the value of complainants' interest in said lands and direct defendants to pay the same and, upon failure to pay, enjoin defendants from occupying the lands and direct them to remove all structures thereon. The petition also prayed for such general relief as complainants might be entitled to. After hearing had on an order to show cause on the petition, the defendants were directed to file answers and it was ordered that all relevant testimony taken on the certiorari proceedings and all exhibits therein, be considered as testimony and exhibits in this cause, with the privilege to the parties of introducing further testimony and exhibits. Answers were filed by the city and by Central District, Inc., and a decree pro confesso was entered against the board in default of filing an answer. The cause came before me for hearing on the issue thus joined.
The first question in dispute to be disposed of is whether on June 7th, 1937, the date of the riparian grant to the city, high water mark on the bay was on lot 7 or lot 8. It appears that in 1875 when the Smith tax map was made for the city, lot 8 was the upland bounding on such high water line, but complainants claim that thereafter, through erosion caused by movement of the water and waves, by ice and water currents, lot 8 was gradually washed away and high water in the bay crept up to and over the westerly line of that lot until the lot became and remained wholly submerged at high tide and a new high water mark was established which is well up on lot 7, west of the easterly line thereof. *Page 12 
For complainants the following evidence was produced: Testimony that a survey was made June 14th, 1911, of lots 7 and 8 which showed high water mark then five feet west of the westerly line of lot 7. Testimony of two civil engineers and surveyors who, on separate occasions between December 2d 1933, and September 21st, 1937, made surveys of lot 7 starting from an established monumented point westward of said lot and thus determined and staked the boundary lines of lot 7, one of whom superintended the erection of a fence along the lot lines as so determined. Both surveyors fixed high water line on lot 7, west of the easterly line thereof, by the physical appearance on the ground as shown by the drift line of wood, gravel and other material washed up and left by the tide; by wet sand after the tide had receded and by placing stakes on the shore and moving the stakes back as the tide came in and thus actually observing tide water running up the shore westward of the east line of lot 7 as surveyed, staked and fenced. Six photographs of the lot showing the fence erected under the surveyor's supervision were put in evidence, three having been taken November 27th, 1935, and the other three July 10th, 1937, all of which taken at high tide disclose the waters of the bay on the shore west of the east line of lot 7 as marked by the fence. The testimony of two witnesses, one of whom lived for seven years on the shore about fifteen feet from lot 7 and the other a police sergeant who noted the fence many times after it had been put up, both of whom were frequent observers of the tide. They testified that ordinary high tide always reaches far shoreward of the east fence. Testimony of a lieutenant commander of the United States navy, retired, who qualified as an expert on tides and who inspected lot 7 several times and testified that ordinary high water line is on the lot its entire length. Testimony of a senior engineer of the board, who made survey of lot 7 November 19th, 1934, and who located high water on that lot its entire length and made a sketch on which he showed the line so found, as well as other high water lines shown at other dates on city tax maps not made from actual surveys, but which line of November 19th, 1934, he afterward erased from his sketch under instructions of an unidentified person. *Page 13 
Defendants produced no actual survey made since 1875 of either of the two lots, offered no evidence to establish actual high water mark in front of block 154 and rested on expert testimony that the accurate method of determining the disputed high water line is to install a gauge below low water in front of the block, read it daily for six months or a year and compare the readings with readings taken simultaneously at a primary gauge station established by the government at the Battery in New York City and by an adjustment of readings, ordinary high water can be established definitely. The expert for defendants testified in this connection that it would take about nineteen years to get accurate readings, but he later said a year's reading would be as accurate as can be obtained and finally conceded that a six months' test would do. I cannot believe that this method is the only way to determine high water line for practical purposes but if it is, it was not adopted by the board before making the grant to the city. And the city, knowing more than six months before receiving the grant that its status as a riparian owner was disputed by complainants, could have but did not locate a tide gauge to take the important readings. On the evidence I must conclude that when the riparian grant was made to the city, lot 8 was entirely submerged at high water and that high water line was on complainants' lot 7.
Block 154 was part of a farm of which Jasper Cadmus died seized in 1845, leaving a will devising the farm to his grandson Jasper A. Cadmus and his issue, with remainder over on failure of issue. One of the children of Jasper A. Cadmus applied to this court to order sale of the lands devised to her parent (then living), and a special master was appointed to make sale. By his deed dated November 13th, 1897, recorded November 16th, 1897, he conveyed lots 7 and 8 to Jasper A. Cadmus and Sarah M., his wife, the description being by lot and block number only as shown on a map of the Cadmus farm made in 1891. This map was not offered as an exhibit in the present cause but I shall assume it showed lot 8 as binding on tidewater of the bay.
Prior to that conveyance, however, the collector of revenue of the city of Bayonne, by virtue of a tax sale held August 10th, 1894, conveyed lot 7 to the city by deed dated August *Page 14 
2d 1897, recorded September 27th, 1897, and by mesne conveyances thereafter title to that lot became vested in complainants, the description in all conveyances being by lot and block number only. It should be mentioned that in proceedings in this court the title of one of the intermediate grantees of lot 7 had been settled and adjudged to be good as against Sarah M. Cadmus and others.
The title to lot 8 being in Jasper A. Cadmus and Sarah M., his wife, by the above mentioned deed from the special master dated November 13th, 1897, and Jasper A. Cadmus having died thereafter, his surviving widow conveyed that lot with other property to Fannie Morris by deed dated January 31st, 1913, recorded February 17th, 1913, by lot and block number as shown on the map of the Cadmus farm, the deed reciting that the conveyed tract was on the westerly shore of the bay and included all riparian and shore rights in the bay. Fannie Morris conveyed said lot and other property to Transport Co. by deed dated July 1st, 1929, recorded September 11th, 1929, the description and recitals therein being the same as in the deed to her, and the Transport Co. conveyed to the city by deed dated April 29th, 1937, recorded June 14th, 1937, the description therein being the same as in the deed to Transport Co., but without recital as to shore line or riparian rights.
Defendants contend that the rights of the parties are to be determined by the riparian situation as it was when the interest of Jasper A. Cadmus and Sarah M. Cadmus in lot 7 was cut off by tax sale and their interest was conveyed to the city by the collector of revenue of Bayonne by deed dated August 2d 1897, complainants being subsequent grantees under that deed. Defendants claim that if on that date when title to lot 8 was in Jasper A. and Sarah M. Cadmus (or the survivor), the line of high water was in front of lot 8, the riparian rights then attached to that lot were retained by Cadmus and could not pass to complainants through subsequent erosion of lot 8 and its submergence under high water of the bay. In support of this position defendants cite Ocean City Association v. Shriver,64 N.J. Law 550; Ocean City Hotel, c., Co. v. Sooy,77 N.J. Law 527. There is no evidence which definitely establishes the line of high water as of August 2d 1897. In 1875 by actual survey, it was found *Page 15 
to be on lot 8 and in the absence of any evidence to the contrary I shall assume there was no alteration in that line down to 1897.
The cases cited involved a situation where the grantees of lots which at the date of the grants were inland lots, claimed ownership of a ripa resulting from erosion which had carried away the land retained by their grantors lying between their lots and the old high water line, but the submerged premises had subsequently emerged. The owners of the inland lots claimed the right to riparian grants covering the emerged land in front of their lots, from the line of what had been high tide as the result of erosion out to and beyond the high tide mark after emergence, on the ground of right to accretions, but the court denied their claim.
The instant case presents a different situation. Here high tide is on complainants' lot 7 and there is no land between their lot and high water mark. I think the rights of the parties must be determined by the riparian situation as it was July 31st, 1913, when Sarah M. Cadmus conveyed lot 8 to Fannie Morris through whom defendants claim, or as that situation is now. Although the recital in said deed and in subsequent deeds for that lot is that the tract of land thereby conveyed bounded on the westerly shore of the bay, the evidence here is that by actual survey made June 14th, 1911, lot 8 was entirely submerged and the line of high water was west of the westerly line of lot 7 and it is shown by subsequent surveys down to September 21st, 1937, and by physical evidence present on lot 7, that such line has receded seaward and was on lot 7 at the time of the riparian grant to the city. It is thus apparent that when Sarah M. Cadmus attempted to convey lot 8 to Fannie Morris, the grantor had no land above tidewater to convey, hence defendants never became riparian owners by virtue of that deed and since that lot was submerged in April, 1937, when it was conveyed to the city and continued to be submerged in June, 1937 (and is still submerged) the city was not a riparian owner entitled to a riparian grant from the board.
When what was once fast land has been lost by gradual erosion and is entirely submerged at high tide, title to the *Page 16 
submerged soil is in the state so long as submergence continues. The principle is that in conveyances of land on tide water, the grantee takes with knowledge of changes to which the shore is subject. He takes no fixed freehold but one that shifts with the changes. He is subject to loss by the same means that may add to his lands and as he is without remedy for his loss, so is he entitled to gain accretions. Stevens v. Paterson and NewarkRailroad Co., 34 N.J. Law 532; Nixon v. Walter, 41 N.J. Eq. 103; reversed, 43 N.J. Eq. 627, solely on the ground that the issue was peculiarly cognizable at law; Camden and Atlantic LandCo. v. Lippincott, 45 N.J. Law 405; Ocean City Association v.Shriver, supra; Dewey Land Co. v. Stevens, 83 N.J. Eq. 314;Seacoast Real Estate Co. v. American Timber Co., 92 N.J. Eq. 219.
If defendants' lot had emerged above high tide prior to the riparian grant to the city, that grantee would have had the right to reclaim it and to be restored to the status of riparian owner (Ocean City Association v. Shriver, supra) but that situation did not exist. Lot 8 has been submerged many years and it cannot be said that the present line of high water will ever recede so as to be on that lot again; it may go further inland. It may be and probably is that the lot is wholly visible at low tide but that fact will not entitle the city to reclaim and receive a riparian grant for it, because no part of the lot is attached to fast land above high water. If the board should make a grant for the land under high water to complainants as owners of lot 7 now binding on the high water line and complainants should fill in and build bulkheads or structures thereon, the city's right to have its lot on the theory that it might emerge above high water, would be lost absolutely. Dewey Land Co. v. Stevens, supra.
By our statutes now embodied in R.S. 12:3-1 et seq., a riparian proprietor of lands on the bay has a preemptive right to a grant or lease of lands below high water mark in front of his upland. No grant or lease can be made to another until six months after the riparian proprietor shall have been notified of application for such grant or license by a nonowner of the upland, and the riparian proprietor shall have neglected to apply therefor. Complainants, as present riparian owners through their title to lot 7, had the preemptive *Page 17 
right to have a grant or lease from the board under their application therefor. Bell v. Gough, 23 N.J. Law 624:Polhemus v. Bateman, 60 N.J. Law 163; Ross v. Mayor, c., ofEdgewater, 115 N.J. Law 477; affirmed, 116 N.J. Law 447. The riparian grant to the city provides that if the city "is not the owner of the upland in front of which but not immediately adjoining which the lands under water hereby granted are situated," then the grant so far as the same binds the state shall be void.
I think that in acting upon the grant in question the board should have taken the situation as it actually was and as could have been determined by a survey of its own. If such a survey showed the line of high water where complainants' evidence shows it to be, the board could not speculate that such line would at some future time go seaward, but finding before it a dispute as to title of the ripa, a question it had no power to examine into or attempt to decide (Ocean City Association v. Shriver,supra), the board should have made no grant to either applicant until the question of title was settled by an appropriate court action.
I conclude that the riparian grant to the city is void and that defendants should be restrained from occupying the lands in front of complainants' lot 7 by means of fill or structures thereon or by any other means. Because the rights in controversy are included in the development of the Bayonne waterfront on the bay for a ship to rail terminal on which project several million dollars have been expended, notwithstanding all work was undertaken and money expended on the development after complainants had filed with the board their application for a riparian lease and with full knowledge in defendants of complainants' claim, I think it would be equitable to give defendants an opportunity to acquire complainants' rights by purchase or condemnation. Defendants claim that the city has the right to condemn land required for the public enterprise in which they are engaged and a decree in favor of complainants will be entered on terms to be settled, which will withhold operation of injunctive relief for such reasonable period as will enable the city to institute and complete condemnation proceedings. *Page 18