**UNITED STATES of America**

v.

**STOECO HOMES, INC., a corporation, Appellant.**

No. 73–1805.

United States Court of Appeals, Third Circuit.

Argued March 14, 1974.

Decided May 23, 1974.

598

Joel A. Mott, Jr., Ocean City, N. J., Charles A. Cohen, Camden, N. J., for appellant.

Jonathan L. Goldstein, U. S. Atty., Z. Lance Samay, Asst. U. S. Atty., Chief, Environmental Protection Unit, Newark, N. J., for appellee.

Before ALDISERT, GIBBONS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

The defendant Stoeco Homes, Inc. (hereinafter Stoeco) appeals from an order issued in a suit by the United States of America which permanently enjoined Stoeco from engaging in or permitting any dredge, fill or construction operations in an area in Ocean City, New Jersey, bordered by Bay Avenue, Tennessee Avenue, Spruce Road, and the Back Thorofare of the Intercoastal Waterway, without the prior recommendation of the Army Corps of Engineers and approval of the Secretary of the Army. The government's suit alleges violations of the Rivers and Harbors Appropriation Act of 1899, ch. 425, 30 Stat. 1151, 33 U.S.C. § 401 et seq.

Stoeco has for many years been engaged in the creation of waterfront homesites by dredging and bulkheading lagoons and pumping the dredged materials to adjoining uplands. It acquired the premises in question in 1951 from Ocean City.[1] At the time of this acquisition the land area was substantially above mean high tide. The government contends, however, that prior to 1927 the entire area was a salt water marsh, subject to the ebb and flow of the tide, and that in 1927 R. L. Chester Company, the City's predecessor in title, hydraulically filled the marsh to form firm land suitable for residential development. The land, in 1951, was vacant and overgrown by bayberry. It was bounded on the southwesterly side by Tennessee Avenue, an improved street, on the southeasterly side by Bay Avenue, an improved street, on the northeasterly side by Spruce Road and irregularly on the north, northwesterly and westerly side by Back Thorofare, a part of the Intercoastal Waterway passing through Great Egg Harbor Bay, a tidal estuary. In October, 1951 Stoeco filed with the Army Corps of Engineers a plan (Page 6 of Exhibit P–19) to dredge from Back Thorofare to the premises in question two separate waterway openings. The plan discloses an intention to create, within the premises in question, two separate internal waterway systems. The more northerly opening was to be 500 feet wide at the 1951 high water line. The lagoon system developed off that entrance, now known as Sunny Harbor, does not figure in this litigation. Off the more southerly opening Stoeco proposed to construct what is now known as South Harbor. South Harbor and its tributaries is the subject matter of this litigation and will be described more fully hereafter. On November 2, 1951 the Army Corps of Engineers granted a permit to dredge the two openings to Back Thorofare provided the work was completed by December 31, 1955. The two openings to Back Thorofare were completed within the specified

---

1. Stoeco also obtained from the State of New Jersey a conveyance of the State's interest in land flowed by tidewater. Exhibit P–26.

time and the work was inspected and approved by the Army Corps of Engineers on June 16, 1955. (Page 2 of Exhibit P-19) Thereafter work on the internal lagoon systems was suspended while certain resident taxpayers of Ocean City challenged the validity of Stoeco's title. The contention was that the grantee had not improved the area as rapidly as the conveyance contemplated, and that there should be a forfeiture. *See* Oldfield v. Stoeco Homes, Inc., 26 N.J. 246, 139 A.2d 291 (1958). After that litigation terminated in its favor Stoeco resumed its development, but with a revised plot plan. No change was made in the openings to Back Thorofare, but within the premises in question the lagoon arrangement was revised from that shown on the 1951 application. It should be understood that the 1951 application dealt only with access to the Intercoastal Waterway, not with the internal lagoons. The change, insofar as the South Harbor area is concerned, was from an arrangement in which, from a point near the access to Back Thorofare the harbor was to divide into two long lagoons running parallel to Tennessee Avenue toward Bay Avenue, to an arrangement in which one wider lagoon was to be excavated, running parallel to Tennessee Avenue toward Bay Avenue (South Harbor) and off this main channel, at right angles, parallel to Bay Avenue, five additional lagoons would be excavated on each side. No application was made to the Army Corps of Engineers with respect to the modified plan.

In August 1972, when this suit commenced, the Sunny Harbor part of the development had been completed, sold as homesites and occupied. South Harbor had been completely excavated from Back Thorofare parallel to Tennessee Avenue to a point near Bay Avenue. Off the northeasterly side of South Harbor the five perpendicular lagoons had been completely excavated. These lagoons had been bulkheaded, as had the northeasterly side of South Harbor. All the land on that side of South Harbor had been sold off as homesites, and homes had been erected and occupied. The area between South Harbor and Tennessee Avenue remained undeveloped. Stoeco had substantially completed excavation of three of the five perpendicular lagoons, and had partially completed bulkheading of those three. On April 23, 1971 the Army Corps of Engineers had for the first time taken the position that the South Harbor operations required a permit. Stoeco contested that position and continued operations until enjoined.

Stoeco's method of excavation is to dredge a mixture of solids and water from the excavated area to an upland area surrounded by a manmade dike. The heavier solids settle within the dike and the water flows back, through runoff pipes in the dike, to the lagoons already excavated. The district court found that the runoff pipes returned fines to the lagoons, which tended to cause silting in these lagoons and that occasionally the dikes failed, with a similar result. Such silting has obstructed navigation in South Harbor and in Cayman Harbor, one of the incomplete lagoons running from South Harbor toward Tennessee Avenue. These findings are not clearly erroneous. The district court also found that all of the premises in question between South Harbor and Tennessee Avenue—indeed all of Stoeco's development including those parts already built upon—is within the navigable waters of the United States. We will make more specific reference to the evidence supporting that finding hereafter.

The government contends that the foregoing establishes two violations of the Rivers and Harbors Appropriation Act of 1899. First, it contends that the discharge of silt into South Harbor and Cayman Harbor violates 33 U.S.C. § 407 (originally enacted as Rivers and Harbors Appropriation Act of March 3, 1899, ch. 425, § 13, 30 Stat. 1153 (hereinafter § 13) ) which prohibits the discharge of refuse matter into any naviga-

ble water of the United States.[2] Next, it contends that even if the silting were prevented, since the entire premises in question, though substantially above mean high tide at present, is within the navigable waters of the United States, excavation of the lagoons without a permit violates 33 U.S.C. § 403 (originally enacted as Rivers and Harbors Appropriation Act of March 3, 1899, ch. 425, § 10, 30 Stat. 1151 (hereinafter § 10) ).[3] The district court accepted both contentions and issued an injunction not only against silting of the lagoons but against any improvement of the premises without an Army Corps of Engineers recommendation and an authorization by the Secretary of the Army. Stoeco contends on appeal: (1) that the silting did not take place in the navigable waters of the United States, (2) that even if it did the injunction in its present breadth cannot be sustained on that basis, and (3) that the government has not established that the premises in question are within the navigable waters of the United States.

## I. The § 10 Violation

Since, the broadest government contention, that all of Stoeco's land—indeed all of the land it has developed and sold off—is within the navigable waters of the United States, would, if accepted, amply justify the court's broad injunction, we start our analysis with this § 10 claim.

That claim must be considered in light of the fact that the government's permit policy with respect to § 10 was changed in 1970. Prior to May 27, 1970 it was the policy not to require § 10 permits for construction shoreward of estab-

---

2. "Deposit of refuse in navigable waters generally

It shall not be lawful to throw, discharge, or deposit, or cause, suffer, or procure to be thrown, discharged, or deposited either from or out of any ship, barge, or other floating craft of any kind, or from the shore, wharf, manufacturing establishment, or mill of any kind, any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state, into any navigable water of the United States, or into any tributary of any navigable water from which the same shall float or be washed into such navigable water; and it shall not be lawful to deposit, or cause, suffer, or procure to be deposited material of any kind in any place on the bank of any navigable water, or on the bank of any tributary of any navigable water, where the same shall be liable to be washed into such navigable water, either by ordinary or high tides, or by storms, or floods, or otherwise, whereby navigation shall or may be impeded or obstructed: *Provided,* That nothing herein contained shall extend to, apply to, or prohibit the operations in connection with the improvement of navigable waters or construction of public works, considered necessary and proper by the United States officers supervising such improvement or public work: *And provided further,* That the Secretary of the Army, whenever in the judgment of the Chief of Engineers anchorage and navigation will not be injured thereby, may permit the deposit of any material above mentioned in navigable waters, within limits to be defined and under conditions to be prescribed by him, provided application is made to him prior to depositing such material; and whenever any permit is so granted the conditions thereof shall be strictly complied with, and any violation thereof shall be unlawful."

3. "Obstruction of navigable waters generally; wharves; piers, etc.; excavations and filing in

The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is hereby prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same."

lished harbor lines. That policy is reflected in Exhibit P–19.[4] On May 27, 1970 the Army Corps of Engineers announced a new policy, 35 Fed.Reg. 8280 which appears at 33 C.F.R. § 209.150:

"(a) *Definition.* The term 'harbor line(s)' is used here in its generic sense. It includes types of harbor lines frequently referred to by other names, including, for example, pierhead lines and bulkhead lines.

(b) *Policies, practices and procedures.*

(1) Under previous policies, practices and procedures, riparian owners could erect open pile structures, or undertake solid fill construction shoreward of established harbor lines without obtaining a permit under 33 U.S.C. 403. This was a matter of great concern, particularly in cases involving long established harbor lines, since all factors affecting the public interest may not have been taken into account at the time the lines were established. Accordingly, under previous policies, practices and procedures there was the danger that work shoreward of existing harbor lines could be undertaken without appropriate consideration having been given to the impact which such work may have on the environment. and without a judgment having been made as to whether or not the work was, on balance, in the public interest.

(2) In order to assure that the public interest will be considered and protected in all instances, all existing and future harbor lines are declared to be guidelines for defining, with respect to the impact on navigation interests alone, the offshore limits of open pile structures (pierhead lines) or fills (bulkhead lines). A permit under 33 U.S.C. 403 will be required in each case for any work which is commenced shoreward of existing or future harbor lines after the date of publication of this regulation in the Federal Register. Applications for permits for work in navigable waters shoreward of harbor lines shall be filed and processed in accordance with the provisions of applicable sections of this

4.

"WAR DEPARTMENT
UNITED STATES ENGINEER OFFICE
14th Floor, Penn Mutual Life Insurance Bldg.
Independence Square
Philadelphia, Pa.

19 January 1949

Stoeco Homes, Inc.
800 Ocean Avenue
Ocean City, New Jersey

Gentlemen:

Receipt is acknowledged of your letter of 15 January 1949, in reply to letter from this office dated 10 January 1949, inclosing a sketch of work being undertaken by your company along Great Egg Harbor north of Ninth Street, Ocean City, New Jersey.

Inasmuch as no construction is contemplated channelward from the existing bulkhead at the locality and the dredging for a boat basin is shoreward from the line of the bulkhead, no Department of the Army permit for the work will be required.

FOR THE DISTRICT ENGINEER:

Very truly yours,
ROBERT C. MARSHALL
Major, Corps of Engineers
Assistant District Engineer
Works"

cc: Resident Engine
    Atlantic City, N...

part. For work already completed or commenced in conformance with existing harbor line authority before that date, no permit is required."

Stoeco contends that the 1951 permit was granted under the former policy, and that the only work which was done seaward of harbor lines established in Back Thorofare was that permitted by the 1951 permit. The district court ruled:

"Defendant argues that the Government established federal harbor lines or ratified State harbor lines and that as a result it was relieved of the requirement to obtain a permit for work done shoreward of those harbor lines. This is incorrect in fact and in law. The Federal Government has not established harbor lines in the Back Thorofare area, nor has it, otherwise, ratified or adopted whatever State harbor lines may exist in this area. The presence of federal harbor lines, however, is irrelevant to the requirement of obtaining an appropriate federal permit for work in navigable waters." United States v. Stoeco Homes, Inc., 359 F.Supp. 672, 678 (D.N.J. 1973).

This ruling makes no mention of 33 C. F.R. § 209.150, and is inconsistent with the apparent meaning of that regulation. The regulation appears to refer to actual harbor lines established by any authority. Exhibit P–19 suggests strongly that at least in 1951 the Army Corps of Engineers recognized some harbor lines in Great Egg Harbor seaward of the former marshlands developed by Stoeco. The Secretary of the Army has authority to establish harbor lines. 33 U.S.C. § 404 (originally enacted as Rivers and Harbors Appropriation Act of March 3, 1899, ch. 425, § 11, 30 Stat. 1151 (hereinafter § 11)).[5] The government offered no evidence that after South Harbor' was excavated the Secretary of the Army established such lines in South Harbor. We are hampered in our consideration of the possible effect of 33 C. F.R. § 209.150(b)(2) by the fact that the district court made no reference to it. If that provision applies, it together with the 1951 permit, would seem to justify continuance of Stoeco's project without a further permit, even if the premises in question is within the navigable waters of the United States.

Assuming for discussion, however, that 33 C.F.R. § 209.150(b)(2) does not apply, the government's attempt to require a permit now depends upon a showing that the solid land which Stoeco is excavating is within the navigable waters of the United States. The government does not contend that by excavating (the silting problem aside) Stoeco is modifying "the course, location, condition, or capacity" of Great Egg Harbor. See § 10. It rests its right to the broad injunction granted on the claim that prior to 1927 the premises in question was an estuarine tidal marsh. The Army Corps of Engineers has de-

---

5. "Establishment of harbor lines; conditions to grants for extension of piers, etc.

Where it is made manifest to the Secretary of the Army that the establishment of harbor lines is essential to the preservation and protection of harbors he may, and is hereby authorized to cause such lines to be established, beyond which no piers, wharves, bulkheads, or other works shall be extended or deposits made, except under such regulations as may be prescribed from time to time by him: *Provided,* That whenever the Secretary of the Army grants to any person or persons permission to extend piers, wharves, bulkheads, or other works, or to make deposits in any tidal harbor or river of the United States beyond any harbor lines established under authority of the United States, he shall cause to be ascertained the amount of tidewater displaced by any such structure or by any such deposits, and he shall, if he deem it necessary, require the parties to whom the permission is given to make compensation for such displacement either by excavating in some part of the harbor, including tidewater channels between high and low water mark, to such an extent as to create a basin for as much tidewater as may be displaced by such structure or by such deposits, or in any other mode that may be satisfactory to him."

fined the navigable waters of the United States in 33 C.F.R. § 209.260:

"(a) *Purpose and scope.* This section defines the term 'navigable waters of the United States' as it is used to define authorities of the Corps of Engineers. It also prescribes the policy, practice, and procedure to be used in determining the extent of the jurisdiction of the Corps of Engineers and in answering inquiries concerning 'navigable waters.'

(b) *General policies.* The term 'navigable waters of the United States' is used to define the scope and extent of the regulatory powers of the Federal Government. Precise definitions of 'navigable waters' or 'navigability' are ultimately dependent on judicial interpretation, and cannot be made conclusively by administrative agencies. However, the policies and criteria contained in this section are in close conformance with the tests used by the Federal courts and determinations made under this section are considered binding in regard to the activities of the Corps of Engineers.

(c) *General definition.* Navigable waters of the United States are those waters which are presently, or have been in the past, or may be in the future susceptible for use for purposes of interstate or foreign commerce. A determination of navigability, once made, applies laterally over the entire surface of the water body, and is not extinguished by later actions or events which impede or destroy navigable capacity.

(d) *General scope of determination.* The several factors which must be examined when making a determination whether a water body is a navigable water of the United States are discussed in detail below. Generally, the following conditions must be satisfied:

(1) Past, present, or potential presence of interstate or foreign commerce;

(2) Physical capabilities for use by commerce as in subparagraph (1) of this paragraph;

(3) Defined geographic limits of the water body.

\*  \*  \*  \*  \*  \*

(k) *Geographic and jurisdictional limits of oceanic and tidal waters—* (1) *Ocean and coastal waters.* The navigable waters of the United States over which Corps of Engineers regulatory jurisdiction extends include all ocean and coastal waters within a zone 3 geographic (nautical) miles seaward from the coast line. Wider zones are recognized for special regulatory powers, such as those exercised over the Outer Continental Shelf.

\*  \*  \*  \*  \*  \*

(2) *Bays and estuaries.* Regulatory jurisdiction extends to the entire surface and bed of all water bodies subject to tidal action. Jurisdiction thus extends to the edge (as determined by paragraph (k)(1)(ii) of this section, 'Shoreward Limit') of all such water bodies, even though portions of the water body may be extremely shallow, or obstructed by shoals, vegetation, or other barriers. Marshlands and similar areas are thus considered 'navigable in law,' but only so far as the area is subject to innundation [sic] by the mean high waters. The relevant test is therefore the presence of the mean high tidal waters, and not the general test described above, which generally applies to inland rivers and lakes."

This definition, which was promulgated in September 1972, 37 Fed.Reg. 18290, 18911 reflects the government's position that estuarine tidal marshland which was at anytime subject to inundation by mean high tide is perpetually subject to the navigational servitude of the United States. That position was accepted by the district court and has been accepted by one other district court and approved by the Fifth Circuit, at least with re-

spect to marshland still in that state. *See* United States v. Lewis, 355 F.Supp. 1132 (S.D.Ga.1973). Cf. Zabel v. Tabb, 430 F.2d 199 (5th Cir. 1970), cert. denied, 401 U.S. 910, 91 S.Ct. 873, 27 L. Ed.2d 808 (1971). Stoeco challenges both the legal position and, in this instance, the factual premise for its application. It contends the finding that the area was once a tidal marsh is not supported by any reliable evidence. But more fundamentally, it challenges the constitutionality of a navigational servitude of the extent defined in 33 C.F.R. § 209.260(k)(2).

■ The evidence supporting the government's contention that the premises in question was once a marsh subject to the ebb and flow of the tide is hardly overwhelming. It produced Exhibit P–22, which is Atlas Sheet No. 36, New Jersey Department of Conservation and Economic Development, 1916 Revision, and the testimony of Harold Barker, Jr., an employee of the State of New Jersey. Barker testified that Exhibit P–22 showed the premises in question to be a tidal marsh in 1916, and that other State records established that the entire area was hydraulically filled by R. L. Chester Company in 1927. The extent of ebb and flow of the tide over New Jersey's estuarine marshes has been the subject of extended and extensive litigation in the courts of New Jersey. *See, e. g.,* Keyport Steamboat Co. v. Farmers Transportation Co., 18 N.J. Eq. 13 (Ch. 1866), aff'd 18 N.J.Eq. 511 (1866); Stevens v. Paterson and Newark R.R. Co., 34 N.J.L. 532, 3 Am.Rep. 269 (1870); New Jersey Zinc & Iron Co. v. Morris Canal & Banking Co., 44 N.J.Eq. 398, 15 A. 227 (Ch.1888), aff'd, 47 N. J.Eq. 598, 22 A. 1076 (1890); Simpson v. Moorhead, 65 N.J.Eq. 623, 56 A. 887 (Ch.1904); Moore v. Ventnor Gardens, Inc., 105 N.J.Eq. 730, 149 A. 536 (Ch. 1930) aff'd, 109 N.J.Eq. 132, 156 A. 419 (1931); Ross v. Mayor and Council of Borough of Edgewater, 115 N.J.L. 477,

180 A. 866 (Sup.Ct.), aff'd, 116 N.J.L. 447, 184 A. 810 (1935), cert. denied, 299 U.S. 543, 57 S.Ct. 37, 81 L.Ed. 400 (1936); Harz v. Board of Commerce and Navigation, 126 N.J.Eq. 9, 7 A.2d 803 (Ch.) aff'd 127 N.J.Eq. 341, 12 A.2d 879 (1939). The maps from which Exhibit P–16 was prepared have frequently been challenged. But Stoeco offered no testimony challenging the accuracy of the exhibit or Barker's interpretation. Thus we cannot say the district court's finding that the premises in question was a tidal marsh prior to 1927 is clearly erroneous.

■ The expansive definition of the federal government's navigational servitude may be traced to the enactment in 1958 of The Fish and Wildlife Coordination Act, Pub.L. No. 85–624, 72 Stat. 563 (codified at 16 U.S.C. §§ 661–666), and of The National Environmental Policy Act of 1969, Pub.L. No. 91–190, 83 Stat. 852 (codified at 42 U.S.C. §§ 4331–4347). Prior to these enactments the chief concerns of the Army Corps of Engineers were the prevention of encroachments on the navigational capacity of waters, and the prevention of encroachments on the navigational servitude which the government intended to use for some other purpose, such as flood control, United States v. Rands, 389 U.S. 121, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967) or road building, United States ex rel. Greathouse v. Dern, 289 U.S. 352, 53 S.Ct. 614, 77 L.Ed. 1250 (1933). The Fish and Wildlife Coordination Act requires that any federal agency granting a permit or license to modify any stream or body of water shall first consult with the United States Fish and Wildlife Service, Department of the Interior and also with the head of the agency exercising administration over the wildlife resources of the particular state, ". . . with a view to the conservation of wildlife resources". 16 U.S.C. § 662(a).[6] The National Environmental Policy Act of 1969

---

6. Compare the Fish and Wildlife Act of 1956, ch. 1036, 70 Stat. 1119 (codified at 16 U.S. C.·§ 742i) in which Congress deferred, to some extent, to State regulation over submerged lands.

requires that for every major federal action significantly affecting the human environment the federal agency shall prepare an environmental impact statement. 42 U.S.C. § 4332(c). That requirement is applicable to major federal actions by the Army Corps of Engineers. *E. g.,* Environmental Defense Fund, Inc. v. Froehlke, 477 F.2d 1033 (8th Cir. 1973). Neither The Fish and Wildlife Coordination Act nor The National Environmental Policy Act by their terms apply to State or private activities, although undoubtedly Congressional legislative power under the Commerce Clause would be broad enough to encompass federal regulation of any activities affecting the marine ecology. It is clear that Congress intended that the Army Corps of Engineers and the Secretary of the Army would consult with the Fish and Wildlife Service before issuing a permit for a private dredge and fill operation. *See* S.Rep.No.1981, 85th Cong. 2d Sess. (1958) (reprinted in 2 1958 U.S. Code Cong. & Ad.News 3446–3450). The federal environmental protection statutes did not, however, by their terms enlarge the jurisdiction of the Army Corps of Engineers under the Rivers and Harbors Appropriation Act of 1899. If there is no such jurisdiction environmental protection is still a matter primarily of state concern. We turn, then, to the nature and extent of the federal navigational servitude.

█ We are not dealing with any claim of federal title to the premises in question. It is not located in the coastal zone, but within the boundaries of the State of New Jersey. It is settled law that riparian titles within those boundaries are derived from the State. *See, e. g.,* Pollard's Lessee v. Hagan, 44 U.S. (3 How.) 212, 11 L.Ed. 565 (1845); Hoboken v. Penn Railroad Co., 124 U.S. 656, 8 S.Ct. 643, 31 L.Ed. 543 (1888); Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894); Bailey v. Driscoll, 19 N.J. 363, 117 A.2d 265 (1955); Transcontinental Gas Pipeline Corp. v. Department of Conservation and Economic Development of New Jer-

sey, 43 N.J. 135, 202 A.2d 849 (1964); Schultz v. Wilson, 44 N.J.Super. 591, 131 A.2d 415 (1957); River Development Corporation v. Lberty Corporation, 51 N.J.Super. 447, 144 A.2d 180 (1958); Island Heights v. Presbyterian Camps, 68 N.J.Super. 291, 172 A.2d 228 (1961). Compare United States v. California, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947); United States v. Louisiana, 339 U.S. 699, 70 S.Ct. 914, 94 L. Ed. 1216 (1950); United States v. Texas, 339 U.S. 707, 70 S.Ct. 918, 94 L.Ed. 1221 (1950). Thus neither the relinquishment of title in § 3 of the Submerged Lands Act of 1953, 43 U.S.C. § 1311(b)(1), nor the reservation of a federal navigational servitude in § 6 of that Act, 43 U.S.C. § 1314, bear upon the issues in this case. The latter section reserves from the grant in § 3 the federal government's "navigational servitude and rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce, navigation, national defense, and international affairs", but does not purport to enlarge or to define that servitude.

█ Nor are we dealing with the extent to which the United States must, by virtue of the fifth amendment, compensate the fee owner of premises over which, or adjoining which, it has a navigational servitude, when it takes the premises for federal purposes. Existence of a dominant federal navigational servitude has long been assumed. *See, e. g.,* Gilman v. Philadelphia, 70 U.S. (3 Wall.) 724, 18 L.Ed. 96 (1865); South Carolina v. Georgia, 93 U.S. 4, 23 L.Ed. 782 (1876). It is clear that for purposes of the fifth amendment the fee owner's interest is valued subject to the navigational servitude, regardless of the purpose of the federal taking. *See, e. g.,* United States v. Rands, 389 U.S. 121, 122, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967). *Cf.* United States v. 50 Foot Right of Way in Bayonne, New Jersey, 337 F.2d 956 (3d Cir. 1964). The government points to the condemnation cases as suggesting a broad reading of the

extent of the navigational servitude. But those cases cannot be read as defining the extent of the servitude.

None of the condemnation cases to which we have been referred deal with whether, after the government has permitted improvements within the tidal waters of the United States, either as a result of a permit or by inaction, it can cause the removal of those improvements without paying compensation. Since it is established that the premises in question has been improved solid upland at least since 1927, we must determine (1) whether estuarine tidal marshland was subject to the federal navigational servitude prior to 1927, if so, (2) whether the servitude survived the 1927 improvements to which the government made no objection, and finally (3) whether Congress intended that § 10 was intended to have continuing application to improved land formerly within the navigable waters of the United States. The third question is of enormous· significance to property owners in estuarine areas of New Jersey and other coastal states in the northeast where, perhaps unfortunately, since at least the middle of the nineteenth century there has been extensive development of estuarine marshland. If the permit provisions of that section apply to the premises in question, improved as solid uplands since 1927, they apply as well to thousands of acres of streets, homesites, factory sites and railyards.

We can put aside the question whether under the Commerce Clause, Congress could extend the regulatory jurisdiction of the Army Corps of Engineers to excavations on solid uplands. In the statute on which the government relies Congress did not do so. It extended that jurisdiction only to the navigable waters of the United States. What those waters com-

prise has been the subject matter of an extensive jurisprudence, not all of it completely reconcilable.

■■ A good starting point is Justice Bradley's opinion in Willamette Iron Bridge Co. v. Hatch, 125 U.S. 1, 8 S.Ct. 811, 31 L.Ed. 629 (1888)[7] holding that in the absence of a congressional enactment a state could authorize the obstruction of a navigable stream. He wrote:

"The power of Congress to pass laws for the regulation of the navigation of public rivers, and to prevent any and all obstructions therein, is not questioned. But until it does pass some such law, there is no common law of the United States which prohibits obstructions and nuisances in navigable rivers, unless it be the maritime law, administered by the courts of admiralty and maritime jurisdiction. No precedent, however, exists for the enforcement of any such law; and if such law could be enforced, (a point which we do not undertake to decide,) it would not avail to sustain the bill in equity filed in the original case. There must be a direct statute of the United States in order to bring within the scope of its laws, as administered by the courts of law and equity, obstructions and nuisances in navigable streams within the states."

In reaction to Willamette Iron Bridge Co. v. Hatch, *supra*, Congress passed the Act of Sept. 19, 1890, ch. 907, § 10, 26 Stat. 454, prohibiting "[T]he creation of any obstruction, not affirmatively authorized by law, to the navigable capacity of any waters, in respect of which the United States has jurisdiction . . . ". That statute was superseded by the 1899 Act of which § 10 is a part, and which contains the same "navigable capacity" language. Both statutes were enacted pursuant to the Commerce

---

7. Bradley distinguished The Wheeling Bridge Case, 54 U.S. (13 How.) 518, 14 L.Ed. 249 (1851) as resting upon the interstate compact pursuant to which Kentucky was admitted to the Union, with guaranteed free navigation of the Ohio River. Probably that interpretation of Wheeling Bridge which ante-

dated the decision in The Propeller Genesee Chief v. Fitzhugh, 53 U.S. (12 How.) 443, 13 L.Ed. 1058 (1851), is correct, since until the *Genesee Chief* the Ohio at Wheeling would not have been considered to be in the navigable waters of the United States. *See* page 609 *infra*.

Clause, but neither reached the full extent of Congressional power over commerce. That power was exercised in 1890 to protect "waters, in respect of which the United States has jurisdiction" and in 1899 to protect "waters of the United States." Congress obviously adopted the judicial definition of those waters as of 1890. That definition was the admiralty definition. The classic statement was in Justice Field's opinion in The Daniel Ball, 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1870). Justice Field wrote:

"The doctrine of the common law as to the navigability of waters has no application in this country. Here the ebb and flow of the tide do not constitute the usual test, as in England, or any test at all of the navigability of waters. There no waters are navigable in fact, or at least to any considerable extent, which are not subject to the tide, and from this circumstance tide water and navigable water there signify substantially the same thing. But in this country the case is widely different. Some of our rivers are as navigable for many hundreds of miles above as they are below the limits of tide water, and some of them are navigable for great distances by large vessels, which are not even affected by the tide at any point during their entire length. A different test must, therefore, be applied to determine the navigability of our rivers, and that is found in their navigable capacity. Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water." [footnote omitted]

Stoeco urges that this definition excludes the premises in question, since although the government established that the marshland was subject to the ebb and flow of the tide in 1927, no showing was made that there ever was actual or even potential use for maritime commerce. Superficially the *Daniel Ball* definition would not seem to apply to a tidal marsh. But a more thorough analysis is required, since Congress adopted the admiralty definition, and that jurisdiction existed from 1789 forward. When Section 9 of the Judiciary Act conferred admiralty jurisdiction upon the district courts, what was referred to was the pre-1789 admiralty jurisdiction. A commentator suggests that colonial commissions and patents granting admiralty jurisdiction contemplated all ". . . places overflowed whatsoever, within the ebbing and flowing of the sea, or high water mark, from all first bridges toward the sea." 4 Benedict on Admiralty 435 (6th ed. 1940). That commentator suggests that this definition of admiralty jurisdiction reflected the successful effort of the law courts in England to confine admiralty jurisdiction. Justice Story in The Steamboat Thomas Jefferson, 23 U.S. (10 Wheat.) 428, 6 L.Ed. 358 (1825) accepted the English definition, holding that navigation on the Missouri River was not within the admiralty jurisdiction because that river was not tidal. *See also* The Planter, 32 U.S. (7 Pet.) 324, 8 L.Ed. 700 (1833); The Steamboat Orleans, 36 U.S. (11 Pet.) 175, 9 L.Ed. 677 (1837). But in The Propeller Genesee Chief v. Fitzhugh, 53 U.S. (12 How.) 443, 13 L.Ed. 1058 (1851) Justice Taney made a new start in a case involving a ship collision on the non-tidal Lake Ontario. Congress had in 1845 passed a statute, 5 Stat. 726, extending the district court's admiralty jurisdiction to the Great Lakes and navigable waters connecting

the same. It was suggested that the jurisdiction could be sustained under the Commerce Clause, but this would have presented serious constitutional problems both under the seventh amendment and under article III, section 2. Instead relying on the jurisdiction conferred in § 9 of the 1789 Judiciary Act, Taney redefined navigable waters, for purposes of admiralty jurisdiction, as dependent upon the actual navigable character of the water rather than the ebb and flow of the tide. The well known definition in *The Daniel Ball, supra,* is derived from *The Genesee Chief.*

Stoeco would have us read *The Daniel Ball* and *The Genesee Chief* as both an expansion and a contraction of admiralty jurisdiction; an expansion to non-tidal waters and a contraction, in tidal waters, to areas of actual or reasonably potential navigability. There is no reason to believe that anything other than expansion was intended, however. Subsequent decisions of the Supreme Court do not suggest any contraction. None of those cases, we must concede, deal precisely with the tidal marsh issue. Stoeco urges that Leovy v. United States, 177 U.S. 621, 20 S.Ct. 797, 44 L. Ed. 914 (1900) is authority for the proposition that *The Genesee Chief* represents a contraction as well as an expansion. That case, involving the erection of a dam at Red Pass, on the Mississippi River in Louisiana, does stand for the proposition that a showing of actual capacity for navigation must be made before the 1899 Act applies. But it deals, so far as the opinion discloses, with a dam at a non-tidal location. In non-tidal waters the test is actual or reasonably potential navigability. In tidal waters the test, in our view, remains what it was before 1851, the ebb and flow of the tide. And since it is clear that the 1899 Act and its 1890 predecessor were intended to adopt a definition of navigable waters at least as wide as the admiralty jurisdiction (though Congress could under the Commerce Clause have gone further) we hold that § 10 applies to tidal marshes.

That holding, unfortunately, cannot end our inquiry. As the regulations quoted above make clear, under the administrative agency's prior interpretations of § 10 no permit was required in 1927 when the premises in question were filled to a level substantially above mean high tide. Stoeco acquired the premises in 1951 in a filled state, and with no notice, so far as the government has shown, that the United States claimed a navigational servitude over the entire area. The district court ruled:

> "The fact that this area has been illegally filled does not extinguish its character, in legal contemplation, as part of the navigable waters of the United States, for an area once found to be part of those waters remains so." United States v. Stoeco Homes, Inc., *supra,* at 676.

At oral argument the government took the position that even the occupants of homes on the fully developed part of the Stoeco tract remained in occupation only so long as the United States as a matter of grace declined to assert its navigational servitude. This approach is an oversimplification, for the government did not establish that the 1927 filling operation was illegal. Section 10 by its plain language contemplates congressional consent to some encroachments on the navigational servitude, and delegates to the Army Corps of Engineers and the Secretary of the Army authority to grant such consent on its behalf. If the administrative agency gives an express consent by permit in a specific instance, with no reservation of the right to compel removal, surely that consent must be considered to be a surrender of the federal servitude over the fee in question. Section 10 is silent as to the method of giving consent, but textually a blanket consent with respect to a class of properties does not appear to be prohibited. The longstanding administrative practice, at least prior to 1970, was to require consents for encroachments only beyond pierhead or harbor lines. On the record before us we must assume that this was the adminis-

trative practice when in 1927 the premises in question became fast rather than tidal land. Thus there is no basis for the district court's conclusion that in 1927 the land was illegally filled. When Stoeco purchased in 1951 what then had been fast land for twenty four years the navigational servitude had long since been surrendered. We reach this conclusion as a matter of statutory interpretation of § 10, mindful that though the Congressional power over the regulation of commerce is far reaching that power is limited by the due process and taking clauses of the fifth amendment. Certainly a construction which would, after government inactivity from 1890 to 1970, cast doubt upon the property status of thousands of acres of former tidal marshes would present problems under that amendment. *Cf.* United States v. Pennsylvania Industrial Chemical Corp., 411 U.S. 655, 674, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973).

We conclude, therefore, that the broad injunction against any construction whatsoever in the premises in question cannot be sustained on the theory that a § 10 permit is required for such construction. That holding is limited, of course, to tidal marshlands which had become fast land prior to the change in policy of the Army Corps of Engineers. Any work undertaken in estuarine areas which were subject to the ebb and flow of the tide when the Army Corps of Engineers published its new regulations asserting the navigational servitude to its full extent, are, under the terms of these regulations, now subject to the § 10 permit requirement. 33 C.F.R. § 209.-150(b). The validity of these regulations is not before us.

## II. The § 13 Violations

■■■■■ Since the broad injunction cannot be sustained on the government's § 10 theory, the injunctive remedy for the enforcement of that section contained in § 12, 33 U.S.C. § 406, is inapplicable. But South Harbor, once it was created, became by operation of law a part of the navigable waters of the United States. Thus South Harbor (and its tributary lagoons) are within the compass of § 13. Deposit of dredge fines in those waters is prohibited by § 13. United States v. Pennsylvania Industrial Chemical Corp., *supra*; United States v. Standard Oil Co., 384 U.S. 224, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966). In a suit for injunctive relief to abate discharges under § 13 the plaintiff must show irreparable injury and the scope of injunctive relief must be patterned to the degree of harm. New York v. New Jersey, 256 U.S. 296, 41 S.Ct. 492, 65 L.Ed. 937 (1921); Missouri v. Illinois, 200 U.S. 496, 26 S.Ct. 268, 50 L.Ed. 572 (1906). The United States can, of course, sue to abate a public nuisance under federal common law. Illinois v. City of Milwaukee, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed. 2d 712 (1972). But in such a suit traditional limitations on equitable remedies are applicable.[8] No balancing of interest or need to show irreparable injury is required when an injunction is sought under § 12 to prevent erection or seek removal of an unlawful structure; a remedy we have found to be inapplicable.

■■■■ The district court found that there was irreparable harm to the commercial, navigational and recreational use of the waters of South Harbor.[9] There is no evidence in the record of any commercial use other than that of Stoeco, but the finding of irreparable harm to navigational and recreational use is not clearly erroneous, and injunctive relief against the continuing deposit of dredge fines in the waters of South Harbor and its tributary lagoons was proper. But the injunction went far beyond that, prohibiting any work on Stoeco's premises whether or not a discharge prohibited by § 13 would occur.

■■■■ It seems unlikely that any hydraulic dredging operation can go forward without some discharge of fines

8. The government does not rely on § 10 of the Federal Water Pollution Control Act.

9. Stoeco does not challenge that finding. (Appellant's brief p. 27).

from the run-off of water. Section 13 does not absolutely prohibit hydraulic dredging. If some discharge in the navigable waters of the United States takes place, the Secretary of the Army may permit such deposits in limits to be defined and under conditions prescribed by him. The permit program formerly administered under § 13 is now administered under § 402 of the Federal Water Pollution Control Act Amendments of 1972, Pub.L. No. 92–500, 86 Stat. 816 (codified at 33 U.S.C. § 1251 et seq.), and pursuant to Executive Order No. 11574, 35 Fed.Reg. 19627 (1970). The government did not in this case rely on the Federal Water Pollution Control Act, but did rely on § 13 of the 1899 Act. No hydraulic dredging should be permitted until such time as Stoeco obtains an appropriate discharge permit.

The injunction appealed from will be vacated and the case remanded to the district court for the entry of a modified injunction in accordance with this opinion. The injunction to the extent that it prohibits hydraulic dredging, shall remain in effect until the district court acts.