UNITED STATES of America,
Plaintiff–Appellee,

v.

Marshall C. SASSER, Defendant–Appellant.

No. 91–2635.

United States Court of Appeals,
Fourth Circuit.

Argued March 3, 1992.

Decided June 23, 1992.

Dove Walter Green, Jr., Green & Sasser, Conway, S.C., argued (Phillip D. Sasser, Green & Sasser, Conway, S.C., T. Allen Legare, Jr., Legare, Hare & Smith, Charleston, S.C., on brief), for defendant-appellant.

Vicki Laine Plaut, Environment and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., argued (Barry M. Hartman, Acting Asst. Atty. Gen., Robert L. Klarquist, Ellen Durkee, Environment and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., E. Bart Daniel, U.S. Atty., R. Emery Clark, Asst. U.S. Atty., Charleston, S.C., on brief), for plaintiff-appellee.

Before ERVIN, Chief Judge, PHILLIPS, Circuit Judge, and RAMSEY, Senior District Judge for the District of Maryland, sitting by designation.

## OPINION

ERVIN, Chief Judge:

In 1987, the United States Army Corps of Engineers ("the Corps") ordered Marshall C. Sasser to remove barriers blocking access to two streams on his property. Sasser refused to comply, and the government sued Sasser for injunctive relief in the district court below. The district court ruled in the government's favor and ordered Sasser to remove the barriers. 771 F.Supp. 720. The district court found that the Corps had jurisdiction over this matter based on the fact that the two streams were subject to the ebb and flow of the tide. Sasser argues that the Corps lacked subject matter jurisdiction, that the Corps did not follow its own regulations, and that the removal of the barriers would constitute a compensable taking of his property. We now affirm.

### I

In 1980, Sasser purchased property in coastal Georgetown County, South Carolina that was formerly a rice plantation. Sasser had spent time on the property and surrounding land since 1950, when his father had purchased some of the land. In 1980, Sasser purchased his present property for $350,000. Sasser claims that he only obtained the property in order to create a private duck hunting club. He has since spent an additional $150,000 to build a clubhouse and make other improvements, and he has sold twelve memberships in his club.

This case concerns two streams. One empties into the Intracoastal Waterway, and the other empties into the Pee Dee River. The Intracoastal Waterway and the Pee Dee River are navigable waters of the United States. The two streams in question are natural bodies of water that originate on privately owned land and serve to drain the old rice fields. The parties have stipulated that both streams are subject to the ebb and flow of the tide; that is, they rise and fall with the tide. The two streams are also very shallow, subject only to use by canoes and join boats. Since at least the early 1940's, landowners have blocked access to the streams by placing wood and metal gates near the points where they meet the larger bodies of water (the Pee Dee River and the Intracoastal Waterway). In recent years, boaters have continually damaged the gates, and Sasser has repeatedly repaired them. In 1987, after receiving a number of letters and a petition requesting action, the Corps intervened in this feud, ordering Sasser and five other landowners who had blocked off similar streams to remove the barriers. The other five complied, but Sasser refused. The government claims that it sought the removal of the barriers in order to end the boater-landowner dispute and also to allow fishing, bird-watching, wildlife photography, and pleasure boating on the streams.

## II

Sasser first argues that the Corps lacked jurisdiction over the two streams. The Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 403, provides that "[t]he creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited." The Act also authorizes the government to enforce the removal of any such obstruction in the district

courts. 33 U.S.C. § 406. By its terms, the Act "does not apply to ... waters that are not subject to the ebb and flow of the tide and that are not used and are not susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce." 33 U.S.C. § 401. The Army Corps of Engineers is the agency charged with enforcing the Act. Consistent with the Act, the Corps' jurisdiction extends to "navigable waters of the United States," which are defined as "those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce." 33 C.F.R. § 329.4.

In arguing that the Corps lacked jurisdiction, Sasser relies on *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1871), for the proposition that the "ebb and flow" test may no longer be used to establish jurisdiction over waters of the United States. In *The Daniel Ball*, the Supreme Court defined "navigable waters" as waters that:

> form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries, in the customary modes in which such commerce is conducted by water.

*Id.* 77 U.S. (10 Wall.) at 563. Sasser's theory is that the Corps lacked jurisdiction over the two streams in question, because they cannot really be used for interstate commerce, at least not nowadays.* Therefore, he claims that the Corps had no power to order him to remove the gates blocking access to the streams.

■ The Fourth Circuit recently adopted *The Daniel Ball* test as its definition of *admiralty* jurisdiction:

---

* Back when what is now Sasser's property was a rice plantation, the two streams may have been used to transport rice to a mill, which could be classified as "interstate commerce." If so, the streams at that time were "navigable" for purposes of Congress' commerce power, and "when once found to be navigable, a waterway remains so." *United States v. Appalachian Elec. Power,* 311 U.S. 377, 408, 61 S.Ct. 291, 299, 85 L.Ed. 243

(1940). At oral argument, it was also suggested that the streams are presently suited to commercial use by fishing or hunting guides. However, we need not reach the issue of whether the streams were used or are now capable for use in interstate commerce, which would pose difficult evidentiary questions, because we decide this case by applying the "ebb and flow" test.

We thus define navigable water for purposes of admiralty jurisdiction as a body of water which, in its present configuration, constitutes a highway of commerce, alone or together with another body of water, between the states or with foreign countries over which commerce in its current mode is capable of being conducted. *Alford v. Appalachian Power Co.*, 951 F.2d 30, 32 (4th Cir.1991). Although *The Daniel Ball* is thus still good law, it does not support Sasser's theory because it does not apply to this case. Later language in *Alford* exposes the flaw in Sasser's argument:

Admiralty, though, is not concerned with the maintenance of rivers or other bodies of water, but rather with the conduct of those who use them, and it does not extend to the limits of federal power over waters of the United States. Other federal interests may and do justify federal jurisdiction over waters which are defined as navigable for other purposes.

*Id.* at 33 (*citing Kaiser–Aetna v. United States*, 444 U.S. 164, 171–72 & n. 7, 100 S.Ct. 383, 389 & n. 7, 62 L.Ed.2d 332 (1979)). The *Alford* court pointed out that admiralty jurisdiction does not cover the maintenance of bodies of water, which is what this case involves. The jurisdiction that does cover maintaining bodies of water is based on the interstate commerce power. In other words, admiralty jurisdiction (*The Daniel Ball*) and jurisdiction based on the interstate commerce power are defined differently, and Sasser's reliance on the definition of admiralty jurisdiction is misplaced.

■ Sasser's argument that *The Daniel Ball* sounded the death knell for the "ebb and flow" test is without support, in cases such as this one that involve coastal, rather than inland, waters. The Supreme Court has noted that there are at least four tests for determining whether bodies of water are "navigable waters of the United States." *Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). The tests are: (1) ebb and flow, (2) connection with a continuous interstate waterway, (3) navigable capacity, and (4) navi-

gable in fact. *Id.* at 170–72, 100 S.Ct. at 387–88. While the Court has not faced the precise argument that Sasser raises, several Circuit Courts of Appeals have, and all have held that whether waters are subject to the ebb and flow of the tide is a valid test for determining the Corps' jurisdiction over coastal waters. *See, e.g., United States v. DeFelice*, 641 F.2d 1169, 1173–75 (5th Cir.1981); *Leslie Salt Co. v. Froehlke*, 578 F.2d 742, 749–53 (9th Cir.1978); *United States v. Stoeco Homes, Inc.*, 498 F.2d 597, 608–10 (3d Cir.1974). Those courts reasoned that the "ebb and flow" test and *The Daniel Ball* definition of "navigable waters" logically coexist, because *The Daniel Ball* actually expanded admiralty jurisdiction, while abandoning the "ebb and flow" test in coastal waters would serve to contract federal jurisdiction. *See DeFelice*, 641 F.2d at 1175 n. 14; *Stoeco Homes*, 498 F.2d at 610. Moreover, those courts have noted that defining "navigable waters of the United States" to include waters subject to the ebb and flow of the tide is well within the limits of the interstate commerce power. *See Stoeco Homes*, 498 F.2d at 610. Finding the caselaw from other circuits persuasive, we hold that the "ebb and flow" test is a valid means of determining the Corps' jurisdiction over tidal waters.

Next, Sasser argues that the grandfather clause in the Corps' own regulations guarantees the continued existence of the two gates. Under 33 C.F.R. § 330.3(b), no further permits are required for structures when (1) they were completed before December 18, 1968; (2) the Corps had not asserted jurisdiction at the time the activity occurred; and (3) the structures do not interfere with navigation. Both parties agree that this three-part test applies and that all three requirements must be met; they differ only as to the application of the test. There is no dispute over the second requirement, because the Corps did not assert jurisdiction when the gates were first constructed. As for the first requirement, the government argues that the barriers were not completed before 1968, because Sasser has had to repair and replace them continually since that time. Sasser main-

tains that gates have stood at the same sites since the early 1940's, so that they *were* completed before 1968. Because the record as to the existence of the gates since 1968 is unclear, we decline to rule on this requirement.

■ A better basis for deciding this issue is the third part of the grandfather test: whether the gates interfere with navigation. The gates clearly interfere with navigation at the present time, because they prevent boaters from going up the streams. However, Sasser argues that their interference with navigation should be evaluated as of the time they were built—the early 1940's. Sasser's theory is meritless. The regulation does not state that the interference with navigation should be measured as of the time the activity first occurred. In fact, the regulation's plain language ("there *is* no interference with navigation") indicates that the lack of interference must exist at the present time. Also, the regulation applies to a wide range of structures, not just those that interfere with navigation. It makes sense for the regulation to waive future permit requirements only for those existing structures that do not currently interfere with navigation. After all, one purpose of the Rivers and Harbors Act, upon which the regulation is based, is to direct the Corps to prevent and remove obstacles to navigation. In addition, caselaw supports the government's position. *See Fisher v. Danos*, 595 F.Supp. 461, 466–67 (E.D.La.1984), *aff'd*, 774 F.2d 1158 (5th Cir.1985). We therefore hold that the gates are not grandfathered under the Corps' regulations, because the gates currently interfere with navigation.

■ Sasser next argues that the Corps failed to comply with its own regulations and that this failure prevents the government from bringing this action. Sasser bases this argument on 33 C.F.R. § 329.14, which requires the Corps to investigate questions of jurisdiction and navigability by following certain procedures. Sasser cites a number of cases for the proposition that agencies are required to follow their own regulations. However, the regulation in question only requires the Corps to go through the procedures "when jurisdictional questions arise." 33 C.F.R. § 329.14(a). As discussed above, the parties here stipulated that the streams in question are subject to the ebb and flow of the tide, removing any real question of jurisdiction. Sasser's reliance on *The Daniel Ball* did not by itself create a jurisdictional question within the meaning of the regulation. In addition, the government argues that it was justified in bypassing administrative procedures, citing *United States v. Zweifel*, 508 F.2d 1150 (10th Cir.1975) (holding government may proceed in administrative tribunal or, under statute, in district court to clear title to public lands). The Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. §§ 406, 416, states that the Department of Justice and the Attorney General shall conduct the legal proceedings necessary for enforcing the Rivers and Harbors Act. The Act does not require any prior administrative action. Therefore, either because no actual jurisdictional question arose, or under the terms of the Rivers and Harbors Appropriation Act, the Corps' failure to investigate its jurisdiction in this case was immaterial.

■ Finally, Sasser argues that the government will have effected a compensable taking, if we affirm the district court and allow the Corps to remove the gates blocking access to the streams. He points to the $500,000 he has spent in expectation that he would continue to have a private duck hunting club, and he states that allowing pleasure boaters to use the streams will destroy the value of his property. The gates were necessary in the first place, Sasser states, to keep poachers and other trespassers off his land. Sasser relies primarily on *Kaiser–Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). In *Kaiser–Aetna*, developers in Hawaii converted a landlocked lake into a marina with access to the ocean. They planned to charge boat owners $72 per year to use the marina. The government first gave its approval to the developers' plan but then later required the owners to allow free access to the marina. In finding

998

that there was a compensable taking, the Court reasoned that, although the government could not be estopped by its earlier approval, the government's actions had led the marina owners to expect they had the right to exclude others. *Id.* at 179–80, 100 S.Ct. at 392–93. This case differs from *Kaiser–Aetna* in two important respects. First, the Corps in this case did nothing to give Sasser an expectation that he had the right to exclude others. The Rivers and Harbors Act and Corps regulations at issue were in effect before Sasser purchased his property in 1980, and the government at no time gave any approval to Sasser's project. Second, it was important in *Kaiser–Aetna* that Hawaiian state law defined the property in question as private. Here, in contrast, the South Carolina Supreme Court has held that other old rice plantation canals in Georgetown County are navigable waters subject to public use. *South Carolina v. South Carolina Coastal Council,* 346 S.E.2d 716, 719 (S.C.1986). Therefore, we hold that *Kaiser–Aetna* does not require a finding that the Corps has effected a compensable taking.

■ In addition, later Supreme Court cases make it clear that Sasser should seek any possible relief under the Tucker Act in the Court of Claims. *See Preseault v. I.C.C.,* 494 U.S. 1, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990); *United States v. Riverside Bayview Homes,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). In *Preseault,* the Court found a takings claim premature because the appellants had not made use of their Tucker Act remedy. 494 U.S. at 17, 110 S.Ct. at 924. In *Riverside Bayview Homes,* the Court reversed a lower court's decision that the Corps' regulatory jurisdiction over wetlands should be construed narrowly to avoid a takings question. The Court found that requiring or denying a permit to fill wetlands was not necessarily a taking, and that the Tucker Act remedy was available to provide compensation for takings that might result from the Corps' regulatory acts. 474 U.S. at 128–29, 106 S.Ct. at 459–60. Moreover, Sasser's damages are purely speculative at this point; it is impossible to predict whether and to what extent pleasure boaters will adversely affect the value of his duck hunting preserve. We therefore hold that Sasser must bring any future takings action in the Court of Claims.

For the reasons expressed above, the judgment of the district court is hereby AFFIRMED.