663 F.2d 1328
 UNITED STATES of America, Plaintiff-Appellee,
v.
119.67 ACRES OF LAND, MORE OR LESS, SITUATED IN PLAQUEMINES
PARISH, STATE OF LOUISIANA, etc., et al., Defendants;
Chevron U.S.A. Inc. and Chevron Pipe Line Company,
Defendants-Appellants.
 No. 79-2933.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit A*
 Dec. 18, 1981.
 John C. Christian, W. Richard House, Jr., New Orleans, La., for defendants-appellants.
 Marc J. Yellin, Asst. U. S. Atty., New Orleans, La., Edward J. Shawaker, Dirk D. Snel, U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before BROWN, COLEMAN and GEE, Circuit Judges.
 JOHN R. BROWN, Circuit Judge:
 
 
 1
 The present appeal arises out of four condemnation actions commenced in September, 1971, by the Secretary of the Army filing Declarations of Taking, 40 U.S.C. § 258a et seq., and the United States filing Complaints in Condemnation, in order to acquire a "spoil servitude" for the improvement and maintenance of the Southwest Pass of the Mississippi River.[1] The United States deposited estimated just compensation and obtained judgments vesting title to and authorizing immediate possession of the property. Chevron U.S.A., Inc. and Chevron Pipe Line Co. held mineral and surface leases in the areas condemned, and, prior to the condemnation, constructed numerous physical facilities on the leased land. Chevron claimed more than four million dollars as just compensation for the land taken, and, after negotiations, Chevron and the United States entered into an agreement by which Chevron would forgo monetary compensation and the United States would restrict its deposit of spoil in certain areas of land.[2] This Stipulation as to Compensation, covering the very land that was condemned and taken, was entered as the judgment of the District Court in July 1974.[3] This judgment vacated the earlier judgments vesting title in the United States insofar as they were inconsistent with the judgment based on the stipulation.
 
 
 2
 In 1978, the Army Corps of Engineers issued a maintenance dredging permit to Chevron which contained conditions contrary to the stipulation of 1974. On May 12, 1978, Chevron filed a motion to enforce the 1974 judgment. The District Court (Mitchell, J.) granted the motion and ordered the Corps not to insert conditions contrary to the earlier 1974 stipulation.[4] The United States, on July 12, 1978, then filed a motion to set aside the 1974 judgment on grounds that the area condemned was subject to a navigational servitude.[5] Their argument was that the stipulation was null and void because it deprived the United States of its navigational servitude without Congressional authority. Judgment was entered on July 13, 1979, granting the government's motion and setting aside the 1974 judgment insofar as it interfered with "the dominant navigational servitude of the United States." Chevron now appeals from that order.
 
 
 3
 Following this Court's careful review of the controversy, we find that this is another "case of the great United States going back on its word ...." Geisser v. United States, 513 F.2d 862, 863 (5th Cir. 1975), modified in 627 F.2d 745 (5th Cir. 1980), cert. denied, Bauer v. U. S., --- U.S. ----, 101 S.Ct. 1741, 68 L.Ed.2d 226 (1981). For the reasons below, the District Court's order of 1979 will be reversed in favor of Chevron.
 
 
 4
 Chevron's Procedural Challenge: Statute of Limitations
 
 
 5
 The Government's motion to set aside the 1974 judgment was based upon its perception, four years later, that the area condemned was at all times subject to a navigational servitude, thus rendering the condemnation action initiated in 1971 wholly unnecessary in relation to any areas below the plane of mean high tide. Chevron interprets the Government's motion as one for relief from judgments based upon "mistake, inadvertence, surprise, or excusable neglect," F.R.Civ.P. 60(b)(1), and thus barred by a one year statute of limitations. Chevron concedes that the one year statutory bar would not apply if the 1974 judgment were null and void, but urges that the Government's deliberative agreement to the stipulation was, if not valid, at most a merely erroneous, not void, action.
 
 
 6
 Whether or not the motion to set aside the 1974 judgment is timely, of course, depends upon the basis of the motion. While Rule 60(b)(1) motions must be made not later than one year from entry of the judgment, Rule 60(b)(4) motions (void judgment) and 60(b)(6) motions (any other reason justifying relief from the judgment) must be made within a reasonable time. It is generally held that no relief is available under 60(b)(1)-(5) if it would have been available under 60(b)(6), and vice versa. Gulf Coast Building and Supply Co. v. International Brotherhood of Electrical Workers, 460 F.2d 105, 108 (5th Cir. 1972). In the "sound interest of finality, the concept of void judgment must be narrowly restricted." 7 Moore's Federal Practice P 60.25(2). A judgment is not void simply because it is erroneous, but only where the court rendering it lacked jurisdiction over the subject matter or the parties, or if it acted in a manner inconsistent with due process of law. 11 Wright & Miller, Federal Practice and Procedure § 2862 (1973). We are not inclined, therefore, to construe the Government's motion as one for relief under Rule 60(b)(4).
 
 
 7
 In the alternative, the Government urges a construction of their motion to justify it under Rule 60(b)(6). Although an erroneous judgment does not provide grounds for 60(b)(6) relief, the Government's position is bolstered by United States v. 32.40 Acres of Land, More or Less, 614 F.2d 108 (6th Cir. 1980). That court held that 60(b)(6) encompassed a motion to set aside a stipulated condemnation judgment on grounds that the settlement was totally unauthorized. Id. at 114. In light of the Government's argument that the settlement reached with Chevron was unauthorized because of an overriding navigational servitude, such lack of authority would provide grounds for a 60(b)(6) motion if brought within a reasonable time. While four years is certainly a considerable length of time, we recognize the possibility that until the navigational servitude was asserted, the United States would have no reason to realize that it had been compromised. Given the significant governmental and public rights involved in this controversy, we find that the motion was filed within a reasonable time and, for that reason, should not be dismissed as untimely.
 
 
 8
 The Government's Procedural Challenge: No Final Order
 
 
 9
 The Government likewise raises a procedural barrier that the minute entry which is the subject of this appeal is interlocutory and requires dismissal by this Court. The District Judge (Mitchell J.) signed the entry which stated:
 
 
 10
 IT IS ORDERED that the motion of the plaintiff, United States of America, to set aside the Judgment of July 31, 1974 is GRANTED insofar as it affects the area covered by the Stipulation As To Compromise which is located below the plane of the mean high tide, that is the areas which are subject to the dominant navigational servitude of the United States.
 
 
 11
 It is claimed that this order does not indicate an intention to dispose of the entire case. It remains uncertain or later to be determined, the Government argues, what property of Chevron was taken by the spoil servitude which was not subject to the navigational servitude, if any, and the value of that property. Chevron, however, contends that the operative effect of the District Court's order is to take its property without compensation, that compensation being what it gave up in return for the promises of the United States to protect Chevron's facilities in the designated area of the spoil servitude, even if these promises were made as to areas which might have been covered by the navigational servitude.
 
 
 12
 Although the Government's argument is appealing, this Court in February, 1980, had to consider the motion to dismiss this appeal. That motion was denied, presumably on the basis that the only judicial labor remaining, should the case be affirmed, would be that of determining the exact location of the mean high tide line. We chose to hear this appeal because the primary issue in this controversy is whether the District Court was even correct in setting aside the 1974 judgment. Although this prior order of this Court might foreclose further discussion, we think our finding that the 1979 judgment is appealable merits further discussion.
 
 
 13
 In the Government's construction of the controversy, further proceedings are necessary to determine what part of the property, if any, is not subject to the navigational servitude so that compensation may be awarded. However, Chevron argues that the geographical extent or limits of the navigational servitude has already been compromised by the United States in the stipulated agreement to protect Chevron's facilities from spoil or other dredged material. In this construction, the payment of compensation is no longer at issue because the United States through authorized representatives can agree to compromise even a navigational servitude. While this contention merits further analysis, infra, it is clear that Chevron's primary claim has been finally disposed of by the District Court. The 1979 order assumes that a navigational servitude persists in conflict with the 1974 judgment enforcing the compromise agreement, an interpretation that Chevron challenges.
 
 
 14
 We find that the present appeal follows the contours of the "Cohen Rule." See Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949); 9 Moore's Federal Practice P 110.10. The three characteristics required of an order before it can qualify as a final decision under Cohen include: (i) the order must be a final determination of a separable and collateral claim; (ii) it must present a serious and unsettled question too important to be denied review; and (iii) its review cannot await final judgment because the rights claimed will have been lost. Given the nature of the District Court's order, this separate and recognizable claim that the compromise has priority over the navigational servitude certainly presents an unsettled question as to the rights of those who contract with the United States that will never be reached under the District Court's construction of this controversy.
 
 
 15
 To further explain this conclusion, we must point out that the "finality" of the District Court's judgment is to be found in its absolute rescission of the Stipulation as to Compensation. Although the terms of the judgment might suggest that it is conditioned upon a later finding as to the location of the mean high water mark, the District Court does not waver in the least with regard to its setting aside the Stipulation. If in the proceeding in the District Court or on the present appeal Chevron were seeking compensation for land taken above the high water mark, the Government might assert that there was no appealable final judgment. Quite to the contrary, however, Chevron's claim is brought to enforce the Stipulation as to Compensation, an issue that the District Court has completely and with finality acted upon. What all the present controversy is about is Chevron's claim that the conditions imposed on dredging by the Corps of Engineers were invalid because of the judgment based on the Stipulation as to Compensation. Chevron was not seeking Fifth Amendment compensation, nor was the issue before the Court just compensation. If Chevron prevailed on its claim that the judgment on the Stipulation prohibited the dredging conditions, the case would have been over. The District Court denied that claim. This appeal, challenging the correctness of that denial, seeks reinstatement of the judgment which would put an end to the case.
 
 
 16
 Our finding of appealability is supported by this Court's decision in Covington Grain Co. v. Deal, 638 F.2d 1357, 1360 (5th Cir. 1981), where we stated:In order to be reviewable under the collateral order doctrine, an order must 1) be independent and easily separable from the substance of the other claims in the action; 2) present a need to secure prompt review in order to protect important interests of any party; 3) be examined in the light of practical, rather than narrowly technical, considerations.... (citations omitted)
 
 
 17
 See also Bennett v. Behring Corporation, 629 F.2d 393 (5th Cir. 1980). While we recognize that "(i)mplicit in entertaining any interlocutory order is the hazard that piecemeal appeals will burden the efficacious administration of justice and unnecessarily protract litigation," In re Nissan Motor Corporation Antitrust Litigation, 552 F.2d 1088, 1094 (5th Cir. 1977), the judgment appealed from is a member of "that small class (of interlocutory orders) which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred ...." Cohen, 337 U.S. at 546, 69 S.Ct. at 1225-26, 93 L.Ed. at 1536. Given the difficulty of devising "a formula to resolve all marginal cases coming within what might well be called the 'twilight zone' of finality," the Supreme Court has held that the requirement of finality is to be given a "practical rather than a technical construction." Gillespie v. United States Steel Corp., 379 U.S. 148, 152, 85 S.Ct. 308, 310, 13 L.Ed.2d 199, 203 (1964) quoting Cohen, supra. Avoiding such technicalities, we find that the District Court's judgment, practically speaking, effectively bars further consideration of the Stipulation by that court. As this Court stated in Covington Grain, 638 F.2d at 1360, "Cohen was intended to cover just such a situation."
 
 Binding the Government to its Word
 
 18
 The Government argues that the United States cannot be bound to the Stipulation as to Compensation without the express consent of Congress. A navigational servitude, the argument continues, extends over some if not all of the land in controversy because it is below the mean high water line. Accordingly, the Secretary of the Army need not have instituted condemnation proceedings and the United States attorneys were not authorized to enter into the compromise with Chevron.
 
 
 19
 The Government does not deny the words, or even the agreement, which it, together with its adversaries, importuned the District Court to approve. On the contrary, acknowledging in the best Boy Scout tradition the words spoken, the agreements made, and the consensual judgment entered, the Government, now claiming to be adorned with the protective armor against which neither equities nor accepted morality may penetrate, takes the simple, but awesome position that what it agreed to was of no moment because it was mistaken on the operative facts.
 
 
 20
 The Government is faced with all sorts of litigable claims, e.g., under the Suits in Admiralty Act, 46 U.S.C. § 741 et seq., the Public Vessels Act, 46 U.S.C. § 781 et seq., and the Federal Tort Claims Act, 28 U.S.C. § 1291, in which literally the United States Treasury cannot pay, or be required to pay, damages unless the Government would be liable as a private shipowner, or as a person under the law of the particular state. The issues of such statutory liability are frequently enshrouded in factual doubt and equal uncertainty as to a legal basis. But surely the time-honored practice of compromising such claims, on which a judgment is entered, is neither open to question nor does it give any right to the Government years later to set aside such a compromised settlement judgment on the ground that, in fact, the Government was not liable to any degree.
 
 
 21
 Granting that those who deal with the Government "must turn square corners," Rock Island, Arkansas, & Louisiana Railroad v. United States, 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188, 189 (1920) (Holmes, J.), the Government's authorized agents, including its top legal officer, the Department of Justice, can, in the face of uncertainties-factual, legal, or as to policy-determine that the corner is rounded, not square, or may or may not exist at all. The stipulation at issue in this controversy began with numerous meetings between the attorneys for Chevron and the United States Attorney as well as the United States Corps of Engineers. It was then sent to Washington for approval by the Department of Justice and the Department of the Army. Subject only to some minor changes, the document was obviously found acceptable and an Assistant United States Attorney continued thereafter to represent the United States. The changes requested by the Department of Justice and Department of the Army, as well as other changes requested by the Corps of Engineers, were incorporated, and after 18 months of negotiations the official document was born. To concretize its terms, a joint motion of stipulation was filed by Chevron and the United States. The provisions of the Stipulation as to Compensation were specifically incorporated into the July 13, 1974 judgment. In fact, the rights of the United States are declared to be "limited to the terms, provisions and conditions" of the stipulation. It would be impossible for Chevron to argue its rights in terms more powerful than the stipulation itself, emblazoned as it is with lofty Governmental approval and firm judicial enforcement. Whatever may be the Government's excuses, there can be no doubt that its highest authorities were awake and aware during the negotiations with Chevron.
 
 Where the Marshland Ends
 
 22
 In the abstract, we do not question the proposition that the federal government has the power to control all navigable waters of the United States, and from this power comes the dominant "navigational servitude" which extends to all areas below the ordinary high-water mark.[6] Because a navigational servitude is a Constitutionally granted right of the United States, the Government argues that its attorneys were not authorized to enter into a stipulation compromising that right.
 
 
 23
 Chevron first replies that although the Mississippi River is navigable in fact and is a highway of interstate commerce, and thus subject to the navigational servitude, the adjoining marshlands condemned for the spoil servitude are not. Because the property in this controversy is located on swamp, marsh and overflowed lands, it is urged that the ordinary high water line loses its relevance as a determinant of the body of water's bed. Moreover, Chevron builds a compelling argument based upon the legislative history of Public Law 79-14, 59 Stat. 10 (1945) (authorizing the construction for improvement of the Southwest Pass, as well as other waterways) and Public Law 91-439, 84 Stat. 890 (1970) (appropriating funds, impliedly for the improvements at Southwest Pass).[7] Because money was appropriated to acquire easements for the deposit of spoil on the banks of the Southwest Pass, which were subject to overflow, it is argued that Congress did not intend to assert a navigational servitude.[8]
 
 
 24
 The above arguments, however, are apparently in the alternative, because, according to Chevron, the "issue in this case is not whether the (navigational) servitude applies to the lands upon which Chevron's facilities are located, but whether or not the Secretary of the Army and the Department of Justice had the authority to avoid that determination by filing these condemnation cases and then entering into the Stipulation as to Compensation in order to compromise same." Reply Brief at 9. In other words, even if the land is subject to a navigational servitude, and even if Congress did not intend to except this land from a navigational servitude by designating it a spoil deposit area, the Secretary of the Army has the authority to avoid the issue or the geographical limits thereof by filing condemnation cases and then compromising the claims. In this view, the navigational servitude is surrendered and any further determination of land subject to the servitude is unnecessary.
 
 In Search of the Lost Servitude
 
 25
 In United States v. Stoeco Homes, Inc., 498 F.2d 597, 610 (3d Cir. 1974), the Court recognized that "Section 10 (of the River and Harbors Appropriation Act of March 3, 1899, 30 Stat. 1151, codified at 33 U.S.C. § 403) by its plain language contemplates congressional consent to some encroachments on the navigational servitude, and delegates to the Army Corps of Engineers and the Secretary of the Army authority to grant such consent on its behalf." The Government contends, however, that the particular attorneys for the United States who entered into a compromise with Chevron were not authorized to give up the navigational servitude. Rights held by the United States generally may not be given up through the unauthorized action of government employees. See United States v. Beebe, 180 U.S. 343, 351, 21 S.Ct. 371, 374, 45 L.Ed. 563, 568 (1901); United States v. California, 332 U.S. 19, 39-40, 67 S.Ct. 1658, 1668-1669, 91 L.Ed. 1889, 1900 (1947).
 
 
 26
 In Kaiser Aetna v. United States, 444 U.S. 164, 172, 100 S.Ct. 383, 389, 62 L.Ed.2d 332, 341 (1979), the Supreme Court observed that it "has never held that the navigational servitude creates a blanket exception to the Takings Clause whenever Congress exercises its Commerce Clause authority to promote navigation." The Court continued:
 
 
 27
 While the consent of individual officials representing the United States cannot "estop" the United States, ... it can lead to the fruition of a number of expectancies embodied in the concept of "property,"-expectancies that, if sufficiently important, the Government must condemn and pay for before it takes over the management of the landowner's property.
 
 
 28
 Notably, Kaiser Aetna involved a Hawaiian lagoon considered private property. A developer dredged a channel to connect the pond with the ocean, and the applicability of a navigational servitude was raised in the sense that it became a public throughway. In the present controversy, the Government argues, the land in question has always been subject to the navigational servitude. But that statement of the Government's legal right is no answer to the factual geographic question: where does the navigational servitude begin or end? Faced with this elusive question of fact, it is reasonable to conclude that as in Stoeco, supra, the Secretary of the Army has congressional authority to consent to what might be an encroachment on the navigational servitude.
 
 
 29
 In Chevron's interpretation of the present controversy, it is unnecessary to reach the issue of whether a navigational servitude exists on part or all of the marshland on which Chevron's facilities stand. Assuming, arguendo, that the Government is correct that some if not all of the land is subject to the servitude, then the issue for this Court becomes whether the United States attorneys acting for the Department of the Army, who entered into the compromise with Chevron, were authorized to allow such an encroachment. On the other hand, if we assume, arguendo, that from the early days of the Southwest Pass projects, Congress intended that the land be used for spoil deposits, and thus did not intend to assert a navigational servitude, then the Government's case fails since the 1979 judgment vacating the 1974 compromise with Chevron is wholly based upon a claimed navigational servitude. These two issues alone remain and an affirmative answer to the first is dispositive of the case. However, we find it helpful additionally to address the issue of whether the marshland in question is even subject to a navigational servitude.
 
 An Authorized Agreement
 
 30
 The Government takes the position that Congress did not authorize the Corps of Engineers or the attorneys for the United States to waive the navigational servitude. The United States, in exchange for the express waiver to forgo any monetary claim by Chevron, clearly promised in 1974 that it would not deposit spoil on certain tracts of land, that it would protect various objects in the named areas, and that it would not deposit spoil near certain canals, slips or sludge pits. Four years later, the United States declared that the agreement was entered into without authority, and moved the District Court to set the compromise aside. It is indeed unfortunate that the Government paints a picture of an attorney or two stepping completely outside of the bounds of their authority and contracting away-giving away-without the Government's knowledge, valuable public rights. In actuality, extensive negotiations took place between Chevron, the Corps of Engineers, and the United States Attorney in New Orleans. Once an agreement was reached, the compromise was expressly approved by the Department of the Army as well as the Department of Justice in Washington, D.C., thereafter to be entered as the judgment of a District Court.
 
 
 31
 The trial court refused to require the Government to produce the documents pertaining to the authorization of the compromise, and Chevron's discovery difficulties are not at issue here. Nevertheless, it is in the best interest of government to designate authorities, such as the Department of Justice and its subordinates, to make whatever compromises are reasonable with respect to navigable waterways such as the Southwest Pass. There must come a point at which citizens can depend upon the promises of the United States with regard to their own and the Government's property rights. When an individual representing himself, or a corporation through its attorneys or agents, sits down at the bargaining table with the properly designated representative of the Government, and reaches an agreement that is approved through all the proper bureaucratic channels, such an individual or corporation must be able to have confidence in our Nation's integrity.
 
 
 32
 The Government here does not argue that their attorneys failed to follow regulations, see United States v. Beebe, supra, nor does it identify any improper act on the part of or within the discretion of a governmental agency. Rather, a claimed error is discovered four years after the compromise that supposedly invalidates the agreement. Instead of seeking a solution that would uphold the terms agreed to, such as authorizing a possible encroachment on the navigational servitude, the Government desires to "set the record straight" by reforming the approved document. We cannot approve such a solution.
 
 
 33
 The situation is precisely the same where the Attorney General exercises his authority to compromise and settle any case referred to the Justice Department and to agree to dismissal of actions brought by the government. United States v. Newport News Shipbuilding & Dry Dock Co., 571 F.2d 1283, 1287 (4th Cir.), cert. denied, 439 U.S. 875, 99 S.Ct. 212, 58 L.Ed.2d 189 (1978). Chevron's appeal is not based upon estopping the United States because of wrongful acts of its agents, but upon a District Court judgment incorporating an agreement that was carefully considered and entered into only after much deliberation by Chevron and the fully authorized representative of the United States.
 
 
 34
 We hold that the United States, by its condemnation action that ultimately led to the stipulated agreement and judgment, through its authorized agencies, compromised its right to assert the navigational servitude. However, we find it helpful also to address whether Congress intended, from the early days of the Southwest Pass project, to forgo the navigational servitude.
 
 
 35
 Congressional Intent to Forgo the Navigational Servitude
 
 
 36
 Assuming, in accordance with the Government's evidence, that some, if not all, of the land in controversy would be subject to the navigational servitude because it is below the mean high tide mark, it has been suggested that Congress may, through its delegated authorities, surrender the navigational servitude. Stoeco, 498 F.2d at 610-11. Accordingly, if the Secretary of the Army can surrender the navigational servitude by voluntarily permitting encroachment thereupon, then the Secretary of the Army is surely authorized to file condemnation cases and compromise the claims raised thereby including possible navigational servitudes.
 
 
 37
 In 1945, Congress authorized the improvement of the Southwest Pass.[9] Later in 1970, Congress appropriated funds for the improvements at Southwest Pass, including money to acquire easements for the deposit of soil on the land in the area.[10] Congress left to the Secretary of the Army the decisions as to what actions to take in making the authorized improvements at Southwest Pass. See 33 U.S.C. §§ 591, 594. The very Declarations of Taking at the outset of these proceedings recited that the marshland of the Southwest Pass was needed for the deposit of spoil, and we may assume that the Secretary did not believe the land was subject to the navigational servitude, either because it was not below mean high tide or because Congress did not intend to exercise the navigational servitude in this area needed for spoil deposit.
 
 Conclusion
 
 38
 This is not a case in which the Government made clear its intent to forgo the navigational servitude. However, the compendium of events leading up to this controversy suggests that (i) the United States has for decades been involved in improving the Southwest Pass, (ii) the United States found it necessary to condemn certain areas for spoil servitudes, (iii) Chevron entered into a compromise agreement pursuant to the condemnation proceedings in which the Government in exchange for the express waiver of Fifth Amendment just compensation agreed to protect the facilities on or adjoining the condemned land, and (iv) the agreement between Chevron and the United States was approved and authorized by the Secretary of the Army, the Department of Justice, and all other agencies properly involved in such a proceeding. We hold that the Government has effectively surrendered or compromised away its navigational servitude. Like the Court in Stoeco,We reach this conclusion ... mindful that though the Congressional power over the regulation of commerce is far reaching that power is limited by the due process and taking clauses of the Fifth Amendment. Certainly a construction which would ... cast doubt upon the property status of thousands of acres of former tidal marshes would present problems under that amendment.
 
 
 39
 498 F.2d at 611. Here, although little more than 100 acres are involved, we must conclude that the Government, after four years, has reached the point that it must keep its word. The schizophrenic position that the Government has taken, that is, fully authorizing and entering into an agreement which it now says was unauthorized, is not solved by a legalistic 180 degree reversal to correct its mistakes, if any. Chevron cannot be expected to remain "in occupation only so long as the United States as a matter of grace (declines) to assert its navigational servitude." Stoeco, 498 F.2d at 610.
 
 
 40
 The decision of the District Court setting aside the 1974 judgment was incorrect.
 
 
 41
 REVERSED.
 
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452-October 14, 1980
 
 
 [1]
 The land was condemned in order to guarantee locations for the placement of spoil materials dredged from the Mississippi River by the Corps of Engineers in their continuing efforts to maintain the navigability of the River
 
 
 [2]
 The Stipulation as to Compensation states, in pertinent part:
 (1) No spoil or other dredged material or earth or water carrying same shall be deposited (by the Army Corps of Engineers or its contractors) upon the following parcels of land (a description of the six tracts of land therein follows).
 (2) The United States of America, through the United States Army Corps of Engineers, at its expense, shall protect each and every area described above and all tank batteries, pipelines, pumping stations, service canals, slips, wells, and all other facilities....
 (3) No spoil shall be deposited closer than Fifty (50) feet from any service canal....
 (6) The United States of America and the Corps of Engineers shall be responsible for any and all damages to defendants arising out of the non-compliance with the foregoing terms....
 In consideration of the above terms, conditions and covenants, defendants, Chevron Oil Company and (Chevron) Pipe Line Company, hereby disclaim any and all monetary compensation now due them....
 The said parties hereby consent to the entry of any and all judgments necessary to effect this Stipulation and agreement.
 
 
 [3]
 The Judgment states:
 IT IS ORDERED, ADJUDGED AND DECREED that the rights of the United States of America previously acquired under the judgments rendered by this Court ... be and the same are hereby limited to the terms, provisions and conditions of the aforesaid 'STIPULATION AS TO COMPENSATION' as regards the property, rights and interests of Chevron Oil Company and (Chevron) Pipe Line Company, the terms and provisions of the Stipulation As To Compensation being incorporated herein by reference as if same were copies in extenso, and the aforesaid judgments are hereby vacated insofar as they may be inconsistent with the aforesaid Stipulation As To Compensation, but no further.
 IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all defenses, and all claims to compensation and damages made herein by Chevron Oil Company and (Chevron) Pipe Line Company be and the same are hereby dismissed without prejudice to the rights reserved ... in the aforesaid Stipulation As To Compensation.
 
 
 [4]
 The order stated that the United States and the Corps must "cease from inserting in permits to Chevron U.S.A., Inc. any condition contrary to this Court's judgment of July 31, 1974."
 
 
 [5]
 A "navigational servitude" represents the Government's dominant right over navigable waters for purposes of improving and regulating navigation. As the Supreme Court observed in 1900,
 The primary use of the waters and the lands under them is for purposes of navigation.... Whatever the nature of the interest of a riparian owner in the submerged lands in front of his upland bordering on a public navigable water, his title is not as full and complete as his title to fast land which has no direct connection with the navigation of such water. It is a qualified title, a mere technical title, not at his disposal, as is his upland, but to be held at all times subordinate to such use of the submerged lands and of the waters flowing over them as may be consistent with or demanded by the public right of navigation.
 Scranton v. Wheeler, 179 U.S. 141, 163, 21 S.Ct. 48, 57, 45 L.Ed. 126, 137 (1900). Recently, the Supreme Court observed:
 The navigational servitude is an expression of the notion that the determination whether a taking has occurred must take into consideration the important public interest in the flow of interstate waters that in their natural condition are in fact capable of supporting public navigation.
 Kaiser Aetna v. United States, 444 U.S. 164, 174, 100 S.Ct. 383, 389, 62 L.Ed.2d 332, 343 (1979); see also Willink v. United States, 240 U.S. 572, 580, 36 S.Ct. 422, 424, 60 L.Ed. 808, 810 (1915) (rights possessed in land below the mean high water line were subordinate to the public right of navigation).
 
 
 [6]
 The mean high tide mark is technically defined by the United States Coast and Geodetic Survey as "the average height of all the high waters" at a given place over a period of 18.6 years. Borax Consolidated, Ltd. v. City of Los Angeles, 296 U.S. 10, 26-27, 56 S.Ct. 23, 31, 80 L.Ed. 9, 20 (1935), quoted in Leslie Salt Co. v. Froehlke, 578 F.2d 742, 749 (9th Cir. 1978). As stated in United States v. Holland, 373 F.Supp. 665, 671 (M.D.Fla.1974):
 Borax became a landmark case in the law of tidal boundaries. And even though the test used by the Supreme Court was enunciated to settle a land dispute, and notwithstanding the fact that the test derived from an English court's desire to preserve to property owners so much of the land as is "dry and maniorable", the test of the mean high water mark became the inveterate standard to be applied in limiting federal authority over navigable waters.
 See also Leslie Salt, supra, at 750.
 
 
 [7]
 See discussion of this legislation at notes 9 and 10, infra
 
 
 [8]
 Chevron argues that the election by the Secretary of the Army to follow condemnation procedures, rather than rely upon the navigational servitude, gives rise to the presumption that the marshland was not considered part of the bed of the Mississippi River
 
 
 [9]
 Act of March 2, 1945, Pub.L.No. 79-14, 59 Stat. 10. Following a declaration of Congressional policy to improve the Nation's waterways for navigation, authorization was given for construction of works to operate and maintain navigable waters. The extensive list of regions to be improved included the "Mississippi River Baton Rouge, Louisiana, to the Gulf of Mexico." Specific reference was made to House Document No. 215 (76th Cong.), which contains a report stating, in part:
 The banks of the ... Southwest Passes are kept intact, care being taken to maintain at all times sufficient strength of banks to prevent crevasses from forming .... The banks of the passes are subject to overflow to a depth of from a few inches to a foot during floods ....
 .... Practically all of the land in the vicinity of the passes is covered with marsh grass, cane, or low brush. From an agricultural standpoint the land is worthless, and is utilized only for grazing a few cattle; however, oil is now being produced in several localities in the passes area and extensive exploratory work is in progress.
 Report of the Board of Engineers For Rivers and Harbors, dated January 23, 1939 (Addressed to Chief of Engineers, U.S. Army, Subject: Review of reports, the mouth of the Mississippi River, La.). Congressional authorization for improvement of the Southwest Pass six years later discloses its awareness of the area's condition.
 
 
 [10]
 Act of October 7, 1970, Pub.L.No.91-439, 84 Stat. 890. Counsel for the United States, in their brief in support of the Motion to strike certain of the defenses raised by the landowner/defendants in these very condemnation cases, explained that:
 Funding for this project was authorized by the Act of Congress approved October 7, 1979 (Public Law 91-439). Condemnation of property is not specifically discussed but it is submitted that well established case law makes this unnecessary. (citations omitted)
 Since Congress appropriated money to acquire easements, we may assume, impliedly, that Congress gave to the Secretary of the Army the discretion to provide for the deposit of spoil instead of asserting the navigational servitude.